**FILED**

**DECEMBER 17, 2007**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

AUSA Rachel Cannon (312) 353-5357
AUSA Kruti Trivedi (312) 353-5323

**F I L E D**

# UNITED STATES DISTRICT COURT

NORTHERN    DISTRICT OF ILLINOIS, EASTERN DIVISION

Magistrate Judge Sidney I. Schenkier
United States District Court

UNITED STATES OF AMERICA

v.

RONDELL FREEMAN, aka "Nightfall," "Fall"
and the defendants on the attached list

(Name and Address of Defendant)

MAGISTRATE JUDGE SCHENKIER

**CRIMINAL COMPLAINT**

**CASE NUMBER:**

**07 CR 0843**

I, Joseph Delucio, being duly sworn state the following is true and correct to the best of my knowledge and belief.  Starting no later than in or around 1998, and continuing until the present, at Chicago, in Cook County, in the  Northern  District of  Illinois  defendant(s) did, (Track Statutory Language of Offense)

conspire with each other to knowingly and intentionally distribute and possess with intent to distribute a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine ("crack cocaine"), in violation of Title 21, United States Code Section 841(a),

in violation of Title  21  United States Code, Section(s)  846 .

I further state that I am a(n)  Special Agent, ATF  and that this complaint is based on the following facts:
Official Title

See Attached Affidavit

Continued on the attached sheet and made a part hereof:  X  Yes  ____ No

_Joseph R. Delucio_
Signature of Complainant

Sworn to before me and subscribed in my presence,

December 17, 2007
Date

at Chicago, Illinois
City and State

Hon. Sidney I. Schenkier, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

2.    Brian WILBOURN, aka "Stay High," "3"
3.    Daniel HILL, aka "Little Burling," "Little B"
4.    Adam SANDERS, aka "Redman"
5.    Demarquis WILLIAMS, aka "Buck," "Marco"
6.    Senecca WILLIAMS, aka "Boo Boo"
7.    Reginald BOOKER, aka "Bob"
8.    Syble MCCLUTCHEY, aka "Silver"
9.    Robert FREEMAN, aka "G Rob," "Bob"
10.   Clint LINZY, aka "Big Shorty"
11.   Lonnie MACK, aka "L Dub," "Dub," "4"
12.   Lance OLDEN, aka "LA"
13.   Terrance SEWELL, aka "T Money"
14.   Deshawn SIMMONS, aka "Duke"
15.   Marcell THOMAS, aka "Lil Cell," "Cell"
16.   Darnell WILLIAMS, aka "Don D"

STATE OF ILLINOIS    )                    **UNDER SEAL**
                     )    SS
COUNTY OF COOK       )

### AFFIDAVIT

I, Joseph Delucio, having been duly sworn on oath, depose and state as follows:

1.    I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been so employed for nearly seven years. In connection with my official ATF duties, I investigate criminal violations of the federal narcotics and firearms laws, including but not limited to Title 21, United States Code, Section 841(a) (possession with intent to distribute and the distribution of controlled substances); Title 21, United States Code, Section 846 (conspiracy and attempt to distribute and possess with the attempt to distribute controlled substances); Title 21, United States Code, Section 848 (engaging in a continuing criminal enterprise); Title 21, United States Code, Section 843(b) (the use of a communication facility in facilitating the commission of such narcotics offenses); and Title 18, United States Code, Section 922(g) (the possession of a firearm by a felon). I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics and firearms trafficking, and the laundering and concealing of proceeds of drug trafficking. My current assignment involves investigating narcotics and firearms distribution by street gangs within the Chicago area.

2.    I am familiar with and have participated in all of the normal methods of investigation, including but not limited to visual surveillance, the general questioning of witnesses, the use of informants, the use of pen registers and trap-and-trace devices, court-authorized wiretaps, search

1

warrants, and undercover operations, among other methods. Based on my training and experience, I am familiar with the ways in which drug traffickers conduct their drug-related business, including their methods of distributing narcotics; use of cellular telephones; use of numerical codes and code words to conceal their identities and the nature of their communications; and the common practice of registering and obtaining telephones and assets under false names, or in the names of relatives and/or friends, to avoid financial responsibilities and to make it more difficult for law enforcement to track their criminal activity.

3.      This Affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint alleging that the individuals listed in paragraph four conspired to knowingly and intentionally distribute and possess with intent to distribute controlled substances, namely, cocaine, cocaine base in the form of crack cocaine, heroin, and marijuana, and to aid and abet this conspiracy, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2. Because this Affidavit is submitted for the limited purpose of establishing probable cause to support the Criminal Complaint and the issuance of arrest warrants against the proposed defendants, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit. The statements contained in this Affidavit are based on, among other things: (a) my personal participation in this investigation; (b) information provided by other federal agents, officers of the Chicago Police Department ("CPD"), and other law enforcement officials; (c) information provided by cooperating sources; (d) analysis of subpoenaed phone records and pen register and trap-and-trace data; (e) reviews of consensually-recorded conversations, and conversations and video intercepted

pursuant to court orders, and draft transcripts of such conversations;[1] (f) the training and experience of myself and other law enforcement agents with whom I have spoken; (g) evidence recovered following trash pulls and the execution of search warrants; (h) laboratory analysis reports; (i) CPD arrest reports; (j) conviction records from the Circuit Court of Cook County; and (k) criminal history records maintained by the CPD, Illinois State Police, and the National Crime Information Center.

    4.      Since approximately June 2005, ATF, the Internal Revenue Service ("IRS"), and the CPD have been investigating a faction of the Gangster Disciples (the "GDs") and their drug-trafficking activities. This faction of the GDs (hereinafter the "Cabrini GDs") operates in an area that includes the 18th Chicago Police District, where the Cabrini Green Homes, a public housing development, is located. The proposed defendants in this Criminal Complaint are:

**Rondell FREEMAN, also known as ("aka") "Nightfall," "Fall"**

**Brian WILBOURN, aka "Stay High," "3"**

**Daniel HILL, aka "Little Burling," "Little B"**

**Adam SANDERS, aka "Redman"**

**Demarquis WILLIAMS, aka "Buck," "Marco"**

**Senecca WILLIAMS, aka "Boo Boo"**

**Reginald BOOKER, aka "Bob"**

**Syble MCCLUTCHEY, aka "Silver"**

**Robert FREEMAN, aka "G Rob," "Bob"**

---

[1] To the extent that intercepted and recorded communications are summarized below, those summaries are based on draft and not final transcripts. In addition, they do not include references to all of the topics covered during the course of the intercepted and recorded conversations, nor do they include references to all statements made by the speakers on the topics that are described.

Clint LINZY, aka "Big Shorty"

Lonnie MACK, aka "L Dub," "Dub," "4"

Lance OLDEN, aka "LA"

Terrance SEWELL, aka "T Money"

Deshawn SIMMONS, aka "Duke"

Marcell THOMAS, aka "Lil Cell," "Cell"

Darnell WILLIAMS, aka "Don D"

## I. Overview of the Investigation and the GDs

### A.     The GDs

5.     I am familiar with the GDs from my training and experience as an ATF agent, from speaking with cooperating sources and defendants, from speaking with other agents and CPD officers who specialize in investigating the gang, and from studying materials about the gang, such as the Chicago Crime Commission's 2006 Gang Book entitled "A Detailed Overview of Street Gangs in the Chicago Metropolitan Area."[2] Based on these sources, I am aware that the GDs have existed in Chicago since the 1960's.

6.     Today the GDs are considered the largest street gang in Chicago. A CPD database has identified at least 7,300 members locally, and some estimates run as high as 30,000.[3] The gang typically operates through the existence of smaller factions (at least 36 GD factions have been identified in Chicago). Some GD factions operate on the north side of Chicago, in many suburban

---

[2] The Crime Commission gathered material for its book following input from federal and state law enforcement agencies, prosecutors' offices, the Illinois Department of Corrections, and other sources, such as the Sociology Department of the University of Chicago.

[3] CPD gathers the information that is inputted into its database from admissions made by arrestees about their gang membership, as well as from gang tattoos such arrestees may sport.

4

areas, as well as in an estimated 30 states across the country. The GD street gang is also the largest gang in the 18th Chicago Police District, where the Cabrini Green housing projects are located, and it has historically controlled narcotics trafficking at the Cabrini Green Homes.

**B.    The Cabrini Green Housing Projects**

7.    The Cabrini Green Homes are a composite of four public housing developments located on Chicago's near north side. The site originated with the construction of the Frances Cabrini Row Houses in 1942. By 1962, eight buildings known as the William Green Homes ("the whites") were added to this public housing community property. The Cabrini Green Homes were one of the largest sites in the Chicago Housing Authority inventory, and at its height, the site was home to about 15,000 residents and 3,500 public housing units. Today, approximately 4,700 residents reside at this development.

**C.    Rondell FREEMAN and His Drug-Trafficking Operation**

8.    This investigation has involved a faction of the GDs led by Rondell FREEMAN. From approximately 1998 to May of 2007, FREEMAN's drug trafficking organization controlled substantially all of the crack cocaine, heroin, and marijuana sales in the Cabrini Green housing projects located at 714 W. Division Street (the "714 Division building") and 1230 N. Burling Avenue (the "1230 Burling building").

9.    The FREEMAN drug trafficking organization began operating at the 714 Division building in at least as early as 1998. By 2002, however, FREEMAN's drug trafficking organization had relocated to the 1230 Burling building.[4] During this approximately nine-year period, the FREEMAN drug trafficking organization obtained wholesale quantities of powder cocaine, heroin,

---

[4]  In 2003, the 714 Division building was slated to close. That year tenants began moving out, and by 2005, the building was sealed.

and marijuana; cooked powder cocaine into crack cocaine; and distributed crack cocaine, heroin, and marijuana to members of the Cabrini GDs and their associates for resale at the 714 Division building and the 1230 Burling building.[5]

10.    The drugs distributed by the FREEMAN drug trafficking organization were typically prepared and packaged by FREEMAN and others, including Brian WILBOURN, Robert FREEMAN, and Senecca WILLIAMS. The drugs were then sold at the 1230 Burling building by Reginald BOOKER, Syble MCCLUTCHEY, Daniel HILL, Lance OLDEN, Deshawn SIMMONS, Marcell THOMAS, Darnell WILLIAMS, and Demarquis WILLIAMS. Terrence SEWELL supplied some drugs which the FREEMAN drug trafficking organization sold at the 1230 Burling building; SEWELL also sold drugs elsewhere. Clint LINZY served as a lookout for the organization.

11.    Additionally, Daniel HILL, Brian WILBOURN, Adam SANDERS, and Lonnie MACK supervised FREEMAN's drug trafficking organization's sellers. BOOKER and SYBLE MCCLUTCHEY also collected United States currency derived from the sale of narcotics ("drug proceeds") from FREEMAN's drug sellers. Robert FREEMAN assisted in supplying the FREEMAN drug trafficking organization with firearms.

12.    The following is a summary of the Paragraphs in the Affidavit that refer to each defendant:

**Rondell FREEMAN, aka "Nightfall," "Fall"**: *passim*

**Brian WILBOURN, aka "Stay High," "3"**: 10, 11, 13, 25, 27, 35, 44, 48-49, 54-57, 64,

---

[5]  Typical quantities of cocaine sold or received by wholesale drug dealers are kilograms, half kilograms, quarter kilograms (250 grams, or 9 ounces), one-eighth kilograms (125 grams, or 4 ½ ounces), and one-sixteenth kilograms (63 grams, or 2 ½ ounces). Wholesale quantities of heroin are often sold in 100 gram increments. Wholesale quantities of marijuana are often sold by the pound.

6

68-71, 78-85, 88-95, 103-107, 109-113, 127, 223

**Daniel HILL, aka "Little Burling," "Little B":** 10, 11, 15, 25, 44, 74, 125-26, 133-150, 237, 239

**Adam SANDERS, aka "Redman":** 11, 25, 114-132, 187-88, 191-92, 236-41, 255-58

**Demarquis WILLIAMS, aka "Buck," "Marco":** 10, 25, 49, 50-53, 64-65, 266-71

**Senecca WILLIAMS, aka "Boo Boo":** 10, 44, 78-80, 82, 85-87, 154, 171-180, 250, 260

**Reginald BOOKER, aka "Bob":** 10, 11, 25, 52-53, 108, 117-118, 123-24, 137-140, 153, 157, 163-65, 168-69, 189-90, 197-99, 201-208, 217-217, 225-28, 231, 252

**Syble MCCLUTCHEY, aka "Silver":** 10, 11, 25, 128, 154-56, 158-62, 164-65, 170, 184-86, 235, 252

**Robert FREEMAN, aka "G Rob," "Bob":** 10, 11, 21, 44, 60-61, 64, 66-67, 72-73, 75-76, 80-81, 151-52

**Clint LINZY, aka "Big Shorty":** 10, 196-209

**Lonnie MACK, aka "L Dub," "Dub," "4":** 11, 13, 40-41, 101, 247-49

**Lance OLDEN, aka "LA":** 10, 25, 50-51, 119-120, 233-246

**Terrance SEWELL, aka "T Money":** 10, 15, 250-265

**Deshawn SIMMONS, aka "Duke":** 10, 25, 117-118, 181-185, 187-195

**Marcell THOMAS, aka "Lil Cell," "Cell"** 10, 25, 222-232

**Darnell WILLIAMS, aka "Don D":** 10, 19, 25, 210-21

## D.    CONFIDENTIAL WITNESS INFORMATION

### 1.        Summary of information from CW1

13.    CW1 grew up in the 1230 N. Burling building, and became a GD as a teenager.

Sometime during the mid-1990s, CW1 began selling crack.[6] To do so, CW1 cooked powder cocaine

into crack with the help of a drug addict, and then "bagged up" the mixture into "nickel bags," that

is, small zip-lock baggies that sold for $5 each. CW1 then sold the crack cocaine at the 714 Division

building. During the time that CW1 sold crack cocaine in the 714 Division building, Rondell

FREEMAN, Brian WILBOURN, and Lonnie MACK were some of the other Cabrini GDs who sold

drugs there. CW1 is an acquaintance of each.

14.    CW1 stated that s/he learned that in or around 1999, Rondell FREEMAN had a

falling out with Individual B, a high-ranking GD who also sold drugs in the 714 Division building.

According to CW1, Individual B told FREEMAN he had too many GDs selling his (FREEMAN's)

drugs at the 714 Division building. According to CW1, as a result of the conflict, FREEMAN and

members of his drug trafficking organization moved their operation to the 1230 Burling building.

---

[6] In early 2003, CW1 was arrested by the Drug Enforcement Administration (DEA) for possessing with the intent to distribute cocaine base and powder cocaine, in violation of 21 U.S.C. § 841(a)(1). Following his/her arrest, CW1 cooperated with law enforcement in hopes of receiving leniency, and the complaint against him/her was dismissed. At no time, however, were any promises made to CW1 about his/her cooperation. In 2007, CW1 was indicted and charged with possessing with the intent to distribute crack cocaine and cocaine. Later in 2007, CW1 pled guilty to possessing with the intent to distribute crack cocaine, and agreed as part of his/her plea agreement to cooperate fully and truthfully with the government. CW1 is cooperating in the hopes of receiving a reduced sentence in his/her case. CW1 will not be sentenced until the conclusion of his/her cooperation.

    CW1 has multiple arrests, including those for possession of a drugs and a firearm and domestic battery, and has been convicted of the same. At times, CW1 failed to remain in contact with agents, and was arrested for traffic offenses and a drug crime during the period s/he was cooperating with agents. Agents also believe that CW1 disclosed to individuals that the government was investigating targets in the 1230 Burling building. In addition, officers from a local police department have claimed that cooperating sources in their investigations have alleged that CW1 has trafficked in firearms and narcotics, including during the time period when CW1 was cooperating with investigators in the present case. CW1, by contrast, has admitted to engaging in gun trafficking prior to cooperating with the government, but denies that s/he has done so since working with investigators.

    The information CW1 has provided has proven reliable, and much of the information he/she has provided has been corroborated by other CWs, police surveillances, undercover purchases of narcotics, and consensually-recorded conversations.

15.    CW1 stated that after FREEMAN moved his drug operation to the 1230 Burling

building, FREEMAN and members of his drug trafficking organization took over drug sales there

and would not allow anyone else to sell in the building.  According to CW1, Daniel HILL, a.k.a.

"Little Burling," acted as an enforcer for FREEMAN and was among those who would confront

other Cabrini GDs about selling in the 1230 Burling building without FREEMAN's permission.

CW1 has reported that each of the defendants named in this Affidavit, whom CW1 has identified

from photos shown him/her. are GDs, with the exception of defendant TERRANCE SEWELL,

whom CW1 does not know.[7]

16.    CW1 stated that based on what s/he has seen and heard from FREEMAN and

members of his drug trafficking organization, FREEMAN's mid-level managers supervised "servers"

at the 1230 Building, that is gang members who conducted hand-to-hand drug sales with customers.

These servers operated primarily in or near the stairwells of the 1230 Burling building, and

occasionally in a few select apartments, and sold nickel ($5) bags of crack cocaine, capsules of

heroin, and baggies of marijuana.  CW1 advised that FREEMAN's drugs, at times, were packaged

in plastic ziplock baggies with a blue devil marking.  CW1 further advised that this marking signified

to customers that the drugs were supplied by FREEMAN.

17.    CW1 stated that based on what s/he has personally observed and heard from members

of FREEMAN's drug trafficking organization, GDs were positioned in the lobby and near the

stairwells, among other locations at the 1230 Burling building, to act as lookouts when the drug

trafficking organization's narcotics were sold.  These lookouts were instructed to yell a code word,

such as "be up," to alert workers in the building when law enforcement was in the area.  Lookouts

---

[7]  As explained in paragraph 265, however, SEWELL claimed to interviewing agents on March 19, 2007 that he was
a "former" GD.

9

were sometimes equipped with Nextel cellular telephones containing a direct connect feature referred to as a "chirp," which allowed the lookouts to contact each other without having to dial a telephone number. CW1 also advised that members of FREEMAN's drug trafficking organization sometimes armed themselves with firearms and employed other security measures to safeguard against the robbery of drugs or money from workers operating in the building.

18.    CW1 stated that FREEMAN's drug trafficking organization operated in the 1230 Burling building 24 hours per day, 7 days per week, with its members working in shifts. CW1 estimated that FREEMAN's drug trafficking organization brought in at least $8500 per day from illegal drug sales at the 1230 Burling building.

19.    CW1 has made 4 controlled purchases of narcotics in the 1230 Burling building during the investigation. These controlled purchases occurred on September 8, 2005 (from Darnell WILLIAMS for 2.3 grams of crack cocaine, as described herein at paragraphs 211-214), November 1, 2005 (for 1 gram of crack cocaine), August 25, 2006 (for 1.3 grams of crack cocaine), and on November 2, 2006 (for .49 grams of crack cocaine).[8]

## 2.    Summary of information from CW3

20.    CW3 grew up in Cabrini Green, specifically at the public housing high-rise located at 624 W. Division, and met FREEMAN while s/he lived there.[9] Although CW3 moved from

---

[8]  The November 2, 2006 purchase was made along with another individual CW1 brought to the deal.

[9]  In 2006, CW3 was arrested by the DEA for possessing with the intent to distribute cocaine. Following his/her arrest, CW3 cooperated with law enforcement in hopes of receiving a more lenient sentence. At no time were any promises made to CW3 in exchange for his/her cooperation. In the fall of 2006, CW3 pled guilty to conspiring to possess with intent to distribute cocaine. As part of his/her plea agreement, CW3 agreed to fully and completely cooperate with the government. However, at the time of his/her sentencing, CW3 received no sentencing benefit for cooperating. CW3 may still be eligible to receive a sentencing benefit in the form of a Rule 35 motion, however, if s/he continues to cooperate in this investigation.
    CW3 has been arrested approximately 11 times for offenses including first degree murder, drug possession, and battery. In the early 1980s, CW3 was convicted of first degree murder and sentenced to a term of imprisonment,

Cabrini Green in the late 1970's, CW3 often returned to visit friends and family. Several years ago, CW3 became reacquainted with Rondell FREEMAN, known to CW3 as "Fall" or "Nightfall," and began to supply him drugs.

21.    Beginning in or around 2001 or 2002, CW3 related that s/he began to sell approximately 12-16 kilograms of powder cocaine per year to FREEMAN; CW3's last transaction with FREEMAN occurred sometime in January or February 2006. During this last transaction, CW3 sold a ½ kilogram of cocaine to FREEMAN for $9,500. CW3 explained that s/he typically supplied FREEMAN approximately one kilogram at a time, generally on a monthly basis, but that on a few occasions, FREEMAN purchased a kilogram of cocaine almost immediately after having just received one from CW3. CW3 stated that FREEMAN told CW3 these additional purchases were for his "cousin," whom I believe, based on intercepted calls, to be ROBERT FREEMAN. CW3 stated that s/he believed Rondell FREEMAN supplied narcotics at the public high-rise building located at Division and Halsted (which is where the 1230 Burling building is located).

22.    CW3 stated that s/he typically charged Rondell FREEMAN $18,500 per kilogram of cocaine, which FREEMAN usually paid in small denominations of cash wrapped in shrink-wrap. CW3 and FREEMAN often conducted their deals at the BP Amoco gas station located at Clark and LaSalle streets in Chicago. CW3 reported that FREEMAN often drove to their deals in a red Ford Winstar minivan.[10]

---

and in the early 1990s, CW3 was convicted of drug possession and sentenced to another term of imprisonment.
        The information CW3 has provided has proven reliable, and has been corroborated by police surveillances, analysis of pen register and trap and trace data, and court-authorized interceptions.

[10]  Agents surveilled Rondell FREEMAN drive to this gas station on numerous occasions during this investigation and meet with individuals. Agents have also repeatedly surveilled FREEMAN drive a red Oldsmobile minivan, which looks similar to the Ford Winstar minivan. See, e.g., paragraphs 259, 262.

### 3.    Summary of Information from CW4

23.    CW4 lived in the 714 Division building as a young teenager, where s/he became friends with Rondell FREEMAN and Brian WILBOURN.[11] During the mid-1990s, both FREEMAN and WILBOURN also lived at the 714 Division building. Around the age of 18, CW4 became a GD. Beginning around 1998, s/he began to sell crack and heroin at the 714 Division building for other GD members, including FREEMAN. CW4 stated that when s/he sold FREEMAN's drugs at the 714 Division building, s/he often received them from WILBOURN. CW4 stated that through discussions with FREEMAN, WILBOURN, and other Cabrini GDs, s/he learned that FREEMAN supplied the GDs from the 714 Division building with large quantities of crack cocaine and heroin. CW4 reported that FREEMAN's crack cocaine would sometimes be packaged in ziplock baggies containing an orange stripe, and that FREEMAN's heroin would often be packaged in tinfoil.[12] CW4 stated that when s/he sold FREEMAN's narcotics, s/he would often meet WILBOURN in an apartment unit within the 714 Division building to get the drugs. On at least one occasion during the 1990s, FREEMAN personally handed CW4 narcotics to be sold at the 714 Division building. During this time period, CW4 and other GDs regularly used code words and phrases when speaking with each other about drug trafficking, such as the phrase "5-7" for heroin, and "9-7" for crack cocaine.

---

[11]   CW4 is cooperating with law enforcement in the hopes that such cooperation will be considered by the government if s/he is charged as part of this investigation. No promises have been made to CW4 about whether s/he will be charged, and/or about what sentence s/he might receive. CW4 has approximately 11 arrests, including those for drug possession and conspiracy. CW4 was convicted in 1999 for drug possession and sentenced to probation. The information CW4 has provided has proven reliable, and has been corroborated by CW1, police surveillances, undercover purchases of narcotics, and conversations intercepted pursuant to court order.

[12]   As noted in paragraphs 93, 97, and 129, agents have recovered zip-lock baggies with an orange stipe marking as part of this investigation.

24.    CW4 stated that sometime around 2001, FREEMAN moved his drug operation to the 1230 Burling building, commonly referred to by the Cabrini GDs as "New City." Through his/her discussions with FREEMAN and other GD members, CW4 learned that FREEMAN relocated his drug operation after experiencing a conflict with a GD leader from the 714 Division building. CW4 reported that FREEMAN began supplying GD members with crack cocaine packaged in ziplock baggies with a blue devil marking when his drug trafficking organization moved to the 1230 Burling building.

25.    CW4 stated that Brian WILBOURN, Daniel HILL, aka "Little Burling," and other GD members helped sell FREEMAN's drugs at the 714 Division and 1230 Burling buildings. CW4 recalled that HILL began working with FREEMAN to sell drugs shortly before FREEMAN relocated his drug operation to the 1230 Burling building. Additionally, CW4 informed that through his/her discussions with Rondell FREEMAN and other GD members, s/he learned that when Rondell FREEMAN moved his drug operation to 1230 Burling building, FREEMAN assembled a crew of GD members to sell his drugs that included, among others, Adam SANDERS, aka "Redman," Marcell THOMAS, aka "Cell," Demarquis WILLIAMS, aka "Buck," Darnell WILLIAMS, aka "Don D," Deshawn SIMMONS, aka "Duke," Reginald BOOKER, aka "Bob," Syble MCCLUTCHEY, aka "Silver," Lance OLDEN, aka "LA," and others. CW4 related that s/he has seen these individuals (whom CW4 identified for agents by photo) at the 1230 Burling building selling crack cocaine packaged in baggies with a blue devil marking.

26.    CW4 related that once FREEMAN and members of his drug trafficking organization relocated their operation to the 1230 Burling building, they experienced little interference from law enforcement. CW4 stated that the FREEMAN drug trafficking organization's narcotics were of good

13

quality and popular among the users. Consequently, drugs sales at the other Cabrini Green buildings

declined, and GDs operating in the other buildings were upset. CW4 further related that FREEMAN

was very protective of his territory at the 1230 Burling building, and confronted other drug dealers

who tried to sell there.

27.     Beginning around the time the 714 Division building was closed by the Chicago

Housing Authority, CW4 related that s/he began to purchase pound-quantities of marijuana from

FREEMAN and WILBOURN for resale in the 1230 Burling building.  CW4 said s/he typically

bought 2-3 pounds at a time, and typically paid about $800 per pound unless the potency was high,

in which case CW4 paid about $1600 per pound.

### E.  Rondell FREEMAN's Use of the Target Unit

28.     On June 8, 2005, ATF agents surveilled Rondell FREEMAN to the Sheridan Shores

Condominium complex, located at 5740 N. Sheridan Road, Chicago, Illinois (the "Target

Complex"). As surveillance of FREEMAN continued over the next several months, agents observed

that FREEMAN routinely traveled to this location, and that he typically parked in the complex's

parking spot numbered 34.

29.     Agents then spoke with the Target Complex's property manager, and learned that

parking spot number 34 was assigned to the tenant in Unit 3E (the "Target Unit").  Agents also

learned from the property manager that the Target Unit, which is a one-bedroom condominium unit,

is registered in the name of "Individual A."  Agents have since queried "Individual A" through

Autotrack, a commercial database containing identifying information such as telephone numbers,

addresses, and social security numbers.  According to Autotrack, there is one "Individual A"

associated with both the Target Complex and Cabrini Green, and more specifically, with the high-

14

rise building located at 1230 N. Larrabee Street.   Agents have also obtained a copy of an identification card issued by the Illinois Secretary of State on September 13, 2005 for the Individual A with an address of 1230 N. Larrabee St., Chicago, Illinois.  CW1 has identified Individual A as FREEMAN's aunt.

30.      Agents have obtained and reviewed records from the title company that handled the sale of the Target Unit.  These records reveal that the unit was purchased in June of 2000 for $65,000, that the sale was a cash transaction, and that 5 cashiers checks totaling $28,0000 were produced at the closing.  None of the five checks was for more than $10,000, and 3 were issued on the same day by 3 different banks in the amount of $5,000 each.

1.        **Surveillance Video Review and Trash Pulls at the Target Complex**

31.      Between September of 2005 and approximately May 2007, ATF agents regularly reviewed surveillance footage of the Target Complex.[13]  These reviews revealed that approximately four to five times per week, Rondell FREEMAN went to the Target Complex and parked the cars he drove in parking spot number 34.  FREEMAN typically entered the Target Complex through the service door, and left within minutes to hours after his arrival.  FREEMAN frequently left the Target Complex carrying a plastic trash bag, which he then tossed into the Complex's trash dumpsters. Subsequent trash pulls of the trash bags resembling those discarded by Rondell FREEMAN have routinely revealed baggies covered in narcotic residue, as well as other drug paraphernalia such as razor blades, Dormin and Sleepinal pill packagings (narcotics cutting agents), and latex gloves.  On several occasions, FREEMAN's fingerprints were found on the latex gloves.  Over a 21-month

---

[13]  On or about August 31, 2005, agents met with the property manager for the Target Complex. He provided agents with the keys to the complex's maintenance room and gave verbal consent to review the Complex's surveillance video cameras, which are installed throughout the complex.  ATF agents also subsequently installed their own cameras near the Complex in public areas.

period, agents conducted 17 trash pulls in which these types of items were recovered. Details from some of the trash pulls are outlined below.

### a. September 24, 2005 Surveillance Video Review and Trash Pull

32.    On September 24, 2005, surveillance footage of the Target Complex's southwest parking lot revealed that a black male resembling Rondell FREEMAN had thrown a white garbage bag into a trash dumpster located on the complex. Immediately after disposing of the white garbage bag, the male in the video entered a car parked in spot number 34 and left. Within approximately 1 and ½ hours of when this incident occurred, an agent approached the same dumpster into which the male had thrown the white garbage bag, and observed that only one white garbage bag was inside. The agent recovered the bag and examined its contents, which included an empty bottle of Dormin, plastic sandwich bags, empty plastic Sleepinal pill wrappings, 4 clear plastic ziplock baggies with suspect narcotic residue, 4 razor blades with suspect narcotic residue, latex gloves, a face mask, and 11 small ziplock baggies with a red apple logo on them. Subsequent laboratory analysis showed that the residue attached to the 4 clear plastic ziplock baggies was heroin and cocaine, and the residue attached to the 4 razor blades was cocaine base. Subsequent latent print analysis showed that Rondell FREEMAN's fingerprints appeared on one of the latex gloves.

### b.     November 17, 2005 Surveillance Video Review and Trash Pull

33.    On November 17, 2005, surveillance video of the Target Complex's service door revealed that a black male resembling Rondell FREEMAN exited the condominium complex carrying a black plastic bag. Within approximately 3 ½ hours of this incident, an agent approached the complex's trash dumpsters and observed a bag of similar size and color. The agent recovered the bag and examined its contents, which included assorted Dormin and Sleepinal pill packagings, 3 pairs of

16

latex gloves, 4 ziplock bags with suspect narcotic residue attached, and approximately 150 small ziplock bags containing a blue devil's head marking. Subsequent laboratory analysis showed that the residue attached to the four ziplock bags was heroin and codeine.

### c.    January 17, 2006 Surveillance Video Review and Trash Pull

34.    Surveillance video from the Target Complex's service door revealed that on January 16, 2006 at approximately 9:15 p.m., a black male resembling Rondell FREEMAN exited the condominium complex carrying a white plastic garbage bag. Within approximately 9 ½ hours of this incident, an agent approached the complex's trash dumpsters and observed a bag of similar size and color. The agent recovered the bag and examined its contents, which included assorted Dormin and Sleepinal pill packagings, 4 pairs of latex gloves, assorted empty pill capsules, and 19 ziplock bags with suspect residue attached. Subsequent laboratory analysis showed the residue was cocaine, cocaine base, and heroin. Subsequent latent print analysis revealed Rondell FREEMAN's fingerprints on one of the latex gloves.

### d.    March 25, 2006 Surveillance and Trash Pull

35.    On March 25, 2006, ATF agents surveilled the Target Complex. At approximately 7:32 p.m., agents observed Rondell FREEMAN and Brian WILBOURN enter the condominium complex through its service door. Approximately 90 minutes later, FREEMAN and WILBOURN exited the condominium complex through its service door. FREEMAN then walked towards the complex's trash dumpsters and discarded a black plastic bag, and FREEMAN and WILBOURN drove away. Approximately 25 minutes later, agents recovered from the dumpsters a plastic bag similar in size and color to the one discarded by FREEMAN. The bag contained narcotics paraphernalia such as empty Dormin and Sleepinal pill packaging, latex gloves, and plastic baggies with suspect narcotic

17

residue attached. Subsequent laboratory analysis showed the residue to be heroin, and subsequent latent print analysis revealed Rondell FREEMAN's fingerprints on one of the latex gloves.

e.        **October 8, 2006 Trash Pull**

36.    On October 8, 2006, surveillance footage of the Target Complex's parking lot disclosed that at approximately 12:34 p.m., a white sedan arrived in the parking lot and parked in parking spot number 34, the assigned parking spot for the Target Unit. A black male resembling Rondell FREEMAN got out of the car and walked towards the complex's service door. The surveillance video disclosed that at approximately 3:32 p.m., a black male resembling Rondell FREEMAN left the complex and walked towards the complex's trash dumpsters, where he discarded a white plastic bag into the dumpster positioned directly under the complex's trash chute. Moments afterwards, the male resembling FREEMAN entered the car parked in parking spot number 34, and left.

37.    Approximately 2 hours later, an agent approached the dumpster positioned directly under the complex's trash chute and observed a plastic bag similar in size and color to the one previously discarded. An agent recovered the bag and saw that it contained items similar to those found on previous trash pulls, namely, empty Sleepinal and Dormin pill packaging, four latex gloves, and six plastic zip lock baggies containing suspect narcotic residue. The narcotic residue was later confirmed by laboratory testing to be heroin.

38.    The agent also recovered from the plastic bag several miscellaneous pieces of paper from a torn up envelope addressed to Individual A. After reconstructing the pieces to their original form, your Affiant observed that the envelope consisted of hand-written arithmetic and notations,

18

such as initials and nick-names.  Based on my training and experience, I believe this item to be a

drug ledger.

### f.    January 19, 2007 Surveillance Video Review and Trash Pull

39.    January 19, 2007 surveillance video taken of the Target Complex revealed that at

approximately 1:55 p.m., a black male resembling Rondell FREEMAN discarded a yellow plastic

shopping bag into the trash dumpster located directly under the complex's trash chute.  Moments

afterwards, a minivan departed from the lot.  Approximately an hour later, an agent approached the

trash dumpster and found that a plastic bag similar in size and color to the one discard by FREEMAN

rested at the bottom of the dumpster.  The agent recovered the bag and found it to contain narcotic

paraphernalia similar to items recovered during previous trash pulls, such as Dormin and Sleepinal

pill packaging, latex gloves, ziplock baggies, and suspect marijuana stems.  Subsequent laboratory

analysis showed the stems were, in fact, marijuana.

### 2.    April 10, 2007 drug recovery from Lonnie MACK.

40.    On April 10, 2007, agents surveilling the Target Complex at 4:16 p.m. observed

Rondell FREEMAN exit his car, a white Lexus coupe, and enter the Complex through its service

door.  At approximately 5:50 p.m., a black Buick Regal arrived and parked next to FREEMAN's car.

Lonnie MACK exited the Buick Regal and walked towards the Target Complex.[11]  As MACK

approached the Target Complex, he raised his hands into the air and appeared to catch something

from out of a condominium unit located on the west side of the complex, where the Target Unit is

---

[11] ATF agents had previously identified MACK through CPD booking photos, as well as by showing CW1 a picture
of MACK, whom CW1 identified as "L-Dub" or "Dub."

19

located.[12] MACK then entered the complex through its service door. Approximately an hour later, MACK left the complex carrying a black plastic bag and drove away.

41.     Surveillance followed MACK as he drove south on Lake Shore Drive. Approximately four blocks from the 1230 Burling building, CPD officers stopped MACK for having tinted windows. As officers spoke with MACK, they detected a strong odor of cannabis. Officers then searched his car and recovered a black plastic bag containing over 400 grams of suspect cannabis packaged in blue devil ziplock baggies. Of the 400 grams, the state lab tested 46 grams, and has confirmed that the 46 grams are in fact cannabis. Officers arrested MACK for Manufacture/Delivery of Cannabis and cited him for driving a car with tinted windows.

**F.     Court-Authorized Interceptions**

42.     On March 8, 2006, and again on April 19, 2006, Chief Judge Charles P. Kocoras signed orders authorizing the interception of oral communications and visual, non-verbal conduct and activities occurring within the Target Unit.[13]

43.     On July 18, 2006 and August 22, 2006, Chief Judge James F. Holderman signed orders authorizing the interception of wire communications made by Rondell FREEMAN over cellular telephone number (646) 421-1464 ("Target Phone 4"). Also on August 22, 2006, Chief Judge James F. Holderman signed an order authorizing the interception of wire communications made by Reginald BOOKER over cellular telephone number (312) 506-7810 ("Target Phone 5"). During the government's interception of Target Phone 4, the government learned that Rondell

---

[12]  Although surveillance was unable to observe the object caught by MACK, agents believe FREEMAN tossed MACK the key to the complex's service door. Agents had previously observed FREEMAN toss a key from Unit 3E to individuals waiting in the parking lot below.

[13]  The court applications requested permission to monitor solely the kitchen and living room of the Target Unit.

FREEMAN also utilized cellular telephone number (407) 401-6530 ("Target Phone 6") to communicate with members of his narcotics trafficking organization. Accordingly, on October 19, 2006, Chief Judge James F. Holderman authorized the interception of wire communications occurring over Target Phone 6, as well as the interception of wire communications occurring over (312) 546-1178 ("Target Phone 7"), a cellular telephone used by Syble MCCLUTCHEY, Reginald BOOKER, Deshawn SIMMONS, and others.

1.    **Audio and Video Interceptions Within the Target Unit**

44.    Rondell FREEMAN, Robert FREEMAN, Brian WILBOURN, Daniel HILL, and Senecca WILLIAMS were captured in the audio and/or video interceptions occurring within the Target Unit pursuant to court order. Between March 17, 2006 and May 18, 2006, agents observed Rondell FREEMAN purchasing a gun in the Target Unit, and captured Rondell FREEMAN and others preparing and packaging narcotics in the Target Unit, as outlined more fully below. A selection of their recorded activities is summarized below.

a.    **March 25, 2006: Rondell FREEMAN and Brian WILBOURN Prepare and Package Drugs for distribution; Rondell FREEMAN Collects and Counts Drug Proceeds; Rondell FREEMAN attempts to borrow money from Daniel HILL; Rondell FREEMAN Purchases a Firearm through Robert FREEMAN**

45.    On March 25, 2006 at approximately 11:21 a.m., audio and video surveillance revealed Rondell FREEMAN in the living room of the Target Unit wearing latex gloves and holding a kitchen utensil. FREEMAN then walked towards the kitchen, after which the sound of a blender running and the tapping of an object from within the kitchen could be heard. At approximately 11:31 a.m., FREEMAN re-entered the living room still wearing latex gloves, placed a plastic bag on top

of the coffee table, and then stepped out of the living room. He returned seconds later carrying a plate. FREEMAN then placed the plate on top of the coffee table and sat on the couch.

46.    FREEMAN then began stirring the substance on the plate, reached into the plastic bag he had previously brought into the living room, and removed several small objects that appeared to be capsules. FREEMAN scooped these capsule-like objects into the substance on the plate, one after another, and finished by meshing each capsule-like object together. FREEMAN then placed the assembled items into a kitchen utensil.

47.    Based on my training and experience, my knowledge of this investigation, and the subsequent trash pull agents did on this date described at paragraph 77, I believe that FREEMAN was preparing and packaging heroin for distribution.

48.    At approximately 11:41 a.m., as Rondell FREEMAN was preparing capsules of heroin for distribution, FREEMAN answered a cellular telephone and began talking *via* the speaker-phone function to Brian WILBOURN.[14] During their conversation, FREEMAN and WILBOURN had the following exchange:

FREEMAN:    Where Buck at?

WILBOURN:  I think he is at the crib. I don't know. You want me to go over there before go that way?

FREEMAN:    Yea. Call that phone first. I'm a' call and tell him to give me whatever envelopes he got, to give them to me.

49.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call FREEMAN asked WILBOURN if he knew of Demarquis WILLIAMS's

---

[14]  Agents identified WILBOURN's voice after he later arrived at the Target Unit on this date as described herein. Agents had previously viewed a CPD booking photo of WILBOURN.

whereabouts ("Where Buck at?").[15] I believe that FREEMAN also instructed WILBOURN to meet

with WILLIAMS and collect money ("envelopes") that had been earned from the sale of narcotics.

50.     At approximately 12:43 p.m., FREEMAN placed a telephone call from Target Phone

3, a cellular telephone used by Rondell FREEMAN.[16] During this call FREEMAN stated, "LA ...

Buck still there? ... He ain't answering, man. Try to call right now, LA."

51.     Based on my training and experience, as well as my knowledge of this investigation,

I believe FREEMAN asked Lance OLDEN if he knew where Demarquis WILLIAMS was ("LA. ...

Buck still there?").[17] In addition, I believe FREEMAN instructed OLDEN to telephone WILLIAMS

on his behalf ("Try to call right now, LA.").

52.     At approximately 12:46 p.m., FREEMAN again spoke on his cellular telephone.

During this conversation FREEMAN stated, "Hey, ... you got some envelopes, man? ... You say

what? ... some envelopes, nigga ... what you working with? ... Buck, I been dealing with you this

long, and, you don't know what envelopes is?" FREEMAN then stated, "I'm trying to bust a move

... what time you going to the building? ... Right, I want to know because I want you to get it to Bob,

he finna got to holler at me."

---

[15] CW1 has informed agents that Demarquis WILLIAMS's nicknames are "Buck" and "Marco." In addition, agents have examined a website posting on MySpace.com, an Internet Website, that depicts photos of WILLIAMS. The caption above his photo reads "Buck."

[16] On April 6, 2006, agents obtained court orders authorizing the installation of a pen register and trap and trace device for (312) 213-1867, IMSI 310410016217296 (Target Phone 3), a cellular telephone used by Rondell FREEMAN.

[17] I believe FREEMAN was speaking to Lance OLDEN because (a) A review of Cingular phone records disclosed that on this date at 12:43 p.m., Target Phone 3 placed a call to (708) 439-6219. As described in paragraphs 243-44, OLDEN identified (708) 439-6219 as his phone number during a recorded conversation with CW4; and because (b) CW1 and CW4 have related that OLDEN's nickname is "LA."

53.    Based on my training and experience, as well as my knowledge of this investigation, I believe FREEMAN was speaking with Demarquis WILLIAMS and became frustrated with him when he did not understand the code FREEMAN was utilizing ("Buck, I been dealing with you this long, and, you don't know what envelopes is?). I believe FREEMAN also asked WILLIAMS when he planned to arrive at the 1230 Burling building ("What time you going to the building?"), and instructed WILLIAMS to give the money earned from the sale of narcotics to Reginald BOOKER because he, FREEMAN, planned to meet with BOOKER ("Right, I want to know because I want you to get it to Bob, he finna got to holler at me").[18]

54.    At approximately 12:49 p.m., Rondell FREEMAN chirped Brian WILBOURN and began talking over the speaker-phone function.  During their conversation, FREEMAN and WILBOURN had the following exchange:

FREEMAN:        It's cool. I just hollered at him.  I told him to give it Bob.

WILBOURN:        Where he at? On the land?

FREEMAN:        No, he got the envelopes on the land, but he at the crib.  So he going to holler at Bob.

55.    Based on my training and experience, as well as my knowledge of this investigation, I believe FREEMAN told WILBOURN that he had instructed Demarquis WILLIAMS ("Buck") to give the cash obtained from the sale of narcotics to Reginald BOOKER ("No, he got the envelopes on the land.  But, he at the crib.  So, he going to holler at Bob.").

56.    At approximately 1:13 p.m., Brian WILBOURN arrived at the Target Unit and joined FREEMAN.  WILBOURN then walked towards the kitchen, and the sound of a blender running

---

[18] CW1 has stated that Reginald BOOKER answers to the nickname of "Bob."  Additionally, on July 21, 2006 in Call # 4439 over Target Phone 4, BOOKER answered to the name "Bob."

could next be heard.  At approximately 1:37 p.m. WILBOURN re-entered the living room wearing latex gloves, placed a plate on the coffee table, and sat near FREEMAN.  WILBOURN then used an object that resembled a straw to gather a substance on the plate and place it into small objects that appeared to be ziplock baggies.

57.    Based on my training and experience, as well as my knowledge of this investigation, including the trash pull described in paragraph 77, I believe that WILBOURN was preparing and packaging heroin for distribution.

58.    At approximately 3:42 p.m., FREEMAN answered a cellular telephone call inside the Target Unit.  During this telephone conversation FREEMAN stated, "You know where at?  Tell him the same spot.  I'm a pull up at the same spot."

59.    Based on my training and experience, as well as my knowledge of this investigation, I believe that FREEMAN informed a drug associate where he (FREEMAN) would deliver the heroin capsules he had just packaged ("Tell him the same spot.  I'm a pull at the same spot.").

60.    At approximately 3:46 p.m., Rondell FREEMAN spoke to Robert FREEMAN, who had appeared in the living room.[19]  During their conversation Rondell FREEMAN stated, "I'm going to holler at my guy ... I'm trying to do this dirt real quick ... I'm going to grab this money real quick."

61.    Based on my training and experience, as well as my knowledge of this investigation, I believe that Rondell FREEMAN informed Robert FREEMAN that he (Rondell) was leaving the Target Unit to meet with a drug associate ("I'm going to holler at my guy") and provide him narcotics ("I'm trying to do this dirt real quick) and collect money in exchange ("I"m going to grab this money real quick").

---

[19]    Agents had previously identified ROBERT FREEMAN from a CPD booking photo.

62.    At approximately 3:49 p.m., Rondell FREEMAN left the Target Unit and entered a BMW convertible.    Agents followed FREEMAN to the Noble Square Cooperative, located approximately 1 mile east of the 1230 Burling building.  Although agents were not able to maintain constant surveillance of Rondell FREEMAN once he arrived there, they observed his car parked at the Cooperative in a no parking zone, with the hazard lights blinking, for approximately 15 minutes. Agents then observed him return to his car and leave the Noble Square Cooperative at approximately 4:20 p.m. FREEMAN then returned to the Target Unit.

63.    By approximately 4:39 p.m., Rondell FREEMAN had reentered the living room of the Target Unit, where he sat near the coffee table and began counting wads of cash.  At one point, he moved a wad of cash outside the view of the camera, and the sound of a money-counter could be heard.  FREEMAN then returned within view of the camera and bound a wad of cash.

64.    At approximately 5:18 p.m., Rondell FREEMAN spoke with WILBOURN and Robert FREEMAN, both of whom were also inside the Target Unit.  Rondell FREEMAN stated, "I'm trying to do something, and I got to wait on Buck."  Seconds later, FREEMAN began talking on a cellular phone and stated, "You shorted me on that 1500 ... when you short like that, just say it.  Tell a motherfucker ... How you going to play this money situation?"

65.    Based on my training and experience, as well as my knowledge of this investigation, I believe that Demarquis WILLIAMS ("I got to wait on Buck") had failed to provide Rondell FREEMAN with $1500 in cash ("You shorted me on that 1500") for previously fronted narcotics. Rondell FREEMAN then asked WILLIAMS how he (WILLIAMS) was going to pay him ("How you going to play this money situation?").

26

66.     At approximately 6:04 p.m., Robert FREEMAN told Rondell FREEMAN that he knew of a firearms source. Rondell FREEMAN asked, "He got some pistols?" Robert FREEMAN replied, "Yea, a 44 and a 9." Robert FREEMAN then told Rondell FREEMAN that his source was selling them for $400 each. Shortly afterwards, Rondell FREEMAN handed Robert FREEMAN a wad of cash, and Robert FREEMAN left the Target Unit.

67.     Based on my training and experience, as well as my knowledge of this investigation, I believe that Rondell FREEMAN provided Robert FREEMAN with cash to purchase a pistol.

68.     At approximately 6:07 p.m., Brian WILBOURN began wrapping a plastic baggie in cellophane. At approximately 6:19 p.m. WILBOURN told FREEMAN, "I'll give you an ounce of 5-7, and you give me a 4-and-a-bang on what you call it." FREEMAN responded, "C.O.D., G... I ain't going to lose out...You still owe...You need to get right...So, I can."

69.     Based on my training and experience, as well my knowledge of this investigation, I believe that WILBOURN asked FREEMAN to trade him an ounce of heroin ("I'll give you an ounce of 5-7") for 4 and ½ ounces of cocaine ("And you give me a 4-and-a-bang on what you call it."). I also believe that FREEMAN informed WILBOURN that he would only supply him with the cocaine if WILBOURN paid him at the time of delivery ("C.O.D., G").

70.     At approximately 6:24 p.m. Rondell FREEMAN informed WILBOURN, "I already dropped my shit off." WILBOURN then picked up the plastic baggie he had just wrapped in cellophane, and placed it into his coat pocket. At approximately 6:27 p.m., WILBOURN left the Target Complex and entered into the passenger-side of a waiting car, which then departed.

71.     Based on my training and experience, as well as my knowledge of this investigation, I believe that WILBOURN wrapped the heroin he had previously packaged and left to deliver it

27

somewhere. I also believe that Rondell FREEMAN told WILBOURN that he (FREEMAN) had delivered his heroin earlier that afternoon ("I already dropped my shit off.").

72.    At approximately 7:38 p.m., Rondell FREEMAN answered a direct connect telephone call and begin talking *via* the speaker-phone function to Robert FREEMAN. During their conversation, Rondell FREEMAN and Robert FREEMAN had the following exchange:

| | |
|---|---|
| Rondell FREEMAN: | What's up Bob? |
| Robert FREEMAN: | …remember I was… |
| Rondell FREEMAN: | Yea. |
| Robert FREEMAN: | He got two for seven dollars. |
| Rondell FREEMAN: | What he got? |
| Robert FREEMAN: | …one I gave you, but better…little bit more than that. |
| Rondell FREEMAN: | What he want, six? |
| Robert FREEMAN: | No, no, he want, he want seven. |
| Rondell FREEMAN: | He got them on him now? |
| Robert FREEMAN: | … if I can get them, I'll get them. |
| Rondell FREEMAN: | Oh, yea. Tell him to get them right now. |

73.    Based on my training and experience, as well as my knowledge of this investigation, I believe Robert FREEMAN informed Rondell FREEMAN that he (Robert) had met with his firearms source, and that the source was selling two pistols for seven hundred dollars ("He got 2 for 7 dollars"). I further believe that Rondell FREEMAN instructed Robert FREEMAN to purchase the pistols ("Tell him to get them right now.").

74.    At approximately 7:53 PM, Daniel HILL entered the Target Unit and sat on the

couch.[20]  Rondell FREEMAN informed HILL, "I need four hundred right quick."  HILL replied,

"Where am I going to get four hundred right quick from?"  Rondell FREEMAN answered, "…for

the heat.  A nigga got some heat right now."  HILL then stated, "You should of told me that

yesterday."

76.     Approximately an hour later at 8:52 p.m., Robert FREEMAN returned to the Target

Unit and handed Rondell FREEMAN a pistol.  Rondell FREEMAN asked, "Is it a 9?"  Robert

FREEMAN responded, "Yea … this is a throwaway." Rondell FREEMAN then examined the

pistol.[21]

76.     Based on my training and experience, and my knowledge of this investigation, I

believe Rondell FREEMAN, who is a convicted felon, purchased a 9-millimeter pistol ("Is it a 9?")

through Robert FREEMAN, who is not a convicted felon.  I also believe that Robert FREEMAN

provided the pistol to Rondell FREEMAN knowing that it would likely be used by Rondell

FREEMAN and then discarded ("…this is a throwaway").

77.     At approximately 9:05 p.m., agents observed Rondell FREEMAN exit the Target

Complex and discard a black plastic bag into the complex's trash dumpster.  Once FREEMAN left,

agents recovered the bag and found it to contain narcotic packaging paraphernalia, such as assorted

empty Dormin and Sleepinal pill packaging, ziplock baggies, latex gloves, and plastic baggies with

suspect heroin residue attached.  Subsequent laboratory analysis confirmed that the residue was in

fact heroin, and subsequent latent print analysis found Rondell FREEMAN's fingerprints on one of

the latex gloves.

---

[20]   Agents recognized HILL from having previously reviewed a CPD booking photo of him.

[21]   Brian WILBOURN, a convicted felon, later walked around the living room of the Target Unit wearing the pistol
in his waistband.

      **b.**      **March 29, 2006: Brian WILBOURN, Robert FREEMAN, and Senecca WILLIAMS Cook 4 ½ Ounces of Powder Cocaine into Crack cocaine**

78.      On March 29, 2006 at approximately 10:30 p.m., surveillance footage from the Target Complex revealed that Brian WILBOURN and Senecca WILLIAMS entered the Complex through its service door.[22] They were subsequently heard entering the Target Unit, and approximately 28 minutes later, sounds of the scraping and stirring of a pan could be heard.[23] WILBOURN stated, "Boo Boo, air freshener."[24] What sounded like the crackling of a fire was next heard, and WILBOURN said, "Oh shit. I got a mother-fucking fire, Boo Boo." Seconds later, more sounds like the scraping and stirring of a pan were heard, and WILBOURN stated, "Boo Boo, don't open that door, man." At approximately 11:30 p.m., the spraying of an aerosol can was heard.

79.      Based on my training and experience, and my knowledge of this investigation, I believe that WILBOURN and Senecca WILLIAMS were in the kitchen of the Target Unit "cooking" powder cocaine into crack cocaine, when a fire broke out. I also believe WILBOURN was concerned about the smell of the crack cocaine leaking out to other tenants in the Target Complex ("Boo Boo, air freshener ... Boo Boo, don't open that door, man.").

80.      At 11:42 p.m., WILLIAMS met Robert FREEMAN at the Target Complex's service door and let him in. The two then entered the Target Unit, and at approximately 11:43 p.m. Robert FREEMAN stated, "Back at work, huh baby? ... What this is, 125?" WILBOURN replied, "Yea."

---

[22] Agents identified WILLIAMS from having previously reviewed a CPD booking photo of him.

[23] For technical and security reasons, only audio and not video interceptions were occurring in the Target Unit on this date.

[24] CW1 informed agents that Senecca WILLIAMS's nickname is "Boo Boo." Additionally, on September 27, 1999, WILLIAMS told CPD officers his nickname was "Boo Boo" following their arrest of him.

Seconds later Robert FREEMAN stated, "...Nigga, don't, don't do it like this cause it still fresh....You got to pick off, off there." The sound of a pan being scraped was then heard, and Robert FREEMAN stated, "Let me show you how to do this, son ... Pyrex ain't made like it used to be."

81.     Based on my training and experience, as well my knowledge of this investigation, I believe that when Robert FREEMAN entered the kitchen, he asked WILBOURN if he was cooking 4 ½ ounces of powder cocaine into crack (FREEMAN:"What this is, 125?"). I further believe that FREEMAN assisted WILBOURN in cooking the powder cocaine into crack ("Let me show you how to do this, son ... Pyrex ain't made like it used to be.").[25]

**c.     April 1, 2006: Rondell FREEMAN, Brian WILBOURN, and
Senecca WILLIAMS Cook Powder Cocaine into Crack Cocaine**

82.     On April 1, 2006 at approximately 6:57 p.m., surveillance footage from the Target Complex revealed that Rondell FREEMAN, Brian WILBOURN, and Senecca WILLIAMS entered the Target Complex through the service door. Minutes later they arrived in the Target Unit, and Rondell FREEMAN stated, "Let me show you something, Stay High."[26] [27]  Brian WILBOURN replied, "Listen, motherfucker...showed me how to do it. Crush it up. Right? Put everything in there wet. Soon as it all gets wet...Cool... Put it on that. Except I freeze the shit." Seconds later, the sound of water boiling could be heard, and FREEMAN stated, "Look. It'll come back...Drop like, eighteen. That be like, fifty something... Squeeze it...G, I'm going to show you how to do it."

---

[25]  On October 8, 2005, agents conducted a trash pull from the Target Complex that yielded narcotic paraphernalia, including broken pieces of glass from a Pyrex mixing bowl. Attached to the Pyrex was cocaine base residue.

[26]  Only audio and not video interceptions were occurring on April 1, 2006, for the reasons noted in footnote 23.

[27]  CW1 and CW4 have informed agents that "Stay High" is Brian WILBOURN's nickname.

83.    Based on my training and experience, and my knowledge of this investigation, I believe that WILBOURN described for FREEMAN the steps he (WILBOURN) and Robert FREEMAN had used on March 29, 2006 to cook crack cocaine ("Listen, motherfucker...showed me how to do it...Crush it up. Right? Put everything in there wet. Soon as it all gets wet ... Cool ... Put it on that."). I also believe Rondell FREEMAN demonstrated his crack-cooking method ("Let me show you something, Stay High ... Look. It'll come back... drop like, eighteen. That be like, fifty something...Squeeze it...G, I'm going to show you how to do it.").

84.    At approximately 7:07 p.m. the sound of water boiling could be heard, and Senecca WILLIAMS stated, "It coming back up." FREEMAN then told WILBOURN, "G, let me squeeze that shit...Take a deep breath. Squeeze all that shit out of there, G."

85.    Based on my training and experience, and my knowledge of this investigation, I believe that Senecca WILLIAMS described to Rondell FREEMAN and Brian WILBOURN the progress of their crack cocaine cooking ("It coming back up."), which FREEMAN was overseeing ("G, let me squeeze that shit...Take a deep breath. Squeeze all that shit out of there, G.").

86.    At approximately 8:42 p.m., Rondell FREEMAN stated, "Boo Boo. Give me a blade, Boo Boo."

87.    Based on my training and experience, and my knowledge of this investigation, I believe that Rondell FREEMAN wanted to cut the crack cocaine into smaller rocks for resale, and instructed Senecca WILLIAMS to provide him with a razor blade ("Boo Boo. Give me a blade, Boo Boo.").[28]

---

[28] See paragraph 32, which notes that during the September 24, 2005 trash pull agents recovered, among other things, razor blades with cocaine base residue.

### d.    April 10, 2006: Brian WILBOURN Packages Crack Cocaine and Heroin Inside the Target Unit that is Subsequently Recovered by ATF Agents

88.    On April 10, 2006, at approximately 10:22 p.m., agents observed Brian WILBOURN and Individual C arrive at the Target Complex and park in the assigned parking spot for the Target Unit.  The two then entered the Target Complex through the service door.

89.    Upon arriving within the Target Unit, WILBOURN chirped Rondell FREEMAN and spoke with him using the speaker-phone function.[29]  WILBOURN asked, "Where the utensils at?"  Seconds later WILBOURN stated, "Motherfucker at work right now.  About another hour and half."

90.    Based on my training and experience, and my knowledge of this investigation, I believe that  WILBOURN asked FREEMAN where he could find utensils to prepare and package narcotics ("Where the utensils at?").  I also believe that WILBOURN then stated that he was cooking and packaging drugs ("Motherfucker at work right now").

91.    At approximately 10:29 p.m. Individual C stated, "That shit stink ... I thought I was gonna go home smelling like that shit that one day."  Minutes later, the sound of a running blender was heard, and WILBOURN stated, "This is dope."  Individual C responded, "Oh, I ain't never seen it before in the unmade form."

92.    Based on my training and experience, and my knowledge of this investigation, I believe that WILBOURN was preparing and packaging heroin for resale (the sound of the blender running followed by WILBOURN stating, "This is dope.").

93.    At approximately 11:58 p.m. WILBOURN stated in a telephone call, "I'm just now finishing."  Approximately twenty minutes later, on April 11, 2006, WILBOURN and Individual C got into their car and left the Target Complex.  Agents followed them as they traveled south on Lake

---

[29]  Only audio interceptions were occurring with the Target Unit on this date.

Shore Drive until CPD officers assisting in this investigation stopped their car. During the stop, WILBOURN sat hunched over in the front passenger seat. When officers instructed WILBOURN to step out of the car, he took off running. As officers chased him, he tossed a plastic cellophane package near a set of railroad tracks near Congress Parkway and Columbus. Officers eventually apprehended WILBOURN and placed him into custody. An ATF agent recovered the cellophane package and found it to contain numerous ziplock baggies with an orange stripe, each containing either a white rock-like substance or a white powder substance. The rock-like substance was later analyzed and found to be approximately 48 grams of cocaine base in the form of crack cocaine,[30] and the white powder substance approximately 23 grams of heroin.

94.    At approximately 12:45 a.m., CPD officers pretended as though they had not recovered the drugs, and released WILBOURN and Individual C from custody.

95.    Based on my training and experience, as well as my knowledge of this investigation, I believe that WILBOURN and Individual C had previously discussed the drugs that were later recovered from WILBOURN after he tossed them (Individual C: "That shit stink." WILBOURN: "This is dope.").

      e.        **May 24, 2007 Execution of a Delayed Notification Search Warrant at the Target Unit**

96.    On May 24, 2007, investigators executed a delayed notification search warrant, more commonly known as a "sneak-and-steal" warrant at the Target Unit. The terms of the warrant

---

[30] I know from my training and experience that crack cocaine is a street term for cocaine base appearing in a chunky, rock-like form that is often yellowish or off-white in color. I know that crack cocaine is made by mixing powder cocaine with another substance, often baking soda or some such additive, and boiling the mixture, thereby converting the powder cocaine (cocaine hydrochloride) into cocaine base. Accordingly, drugs that have been recovered as part of this investigation that have tested positive for cocaine base following laboratory analysis, and that I have personally examined and found to appear in a chunky, rock-like form consistent with crack cocaine, I have labeled herein as crack cocaine.

34

allowed agents to enter the Target Unit unannounced and in a concealed fashion, photograph items of evidentiary value, and remove certain types of illegal contraband. The terms of the warrant further permitted agents to delay notification of the search warrant's execution so as not to compromise the ongoing investigation.

97.    While executing the search warrant, agents observed in the kitchen of the Target Unit a shoe box containing 29 grams of suspect heroin packaged in two baggies, narcotic paraphernalia such as Dormin and Sleepinal pill packaging, a coffee bean grinder, a digital scale, razor blades, sifters, a bag of empty capsules, and small ziplock baggies having an orange stripe marking. Investigators photographed the contents of the shoe box and collected the suspect heroin. Subsequent laboratory analysis determined that the 29 grams of suspect heroin was in fact heroin.

98.    In the living room agents observed a money counter, a shoe box containing several small ziplock baggies with a blue devil symbol, and a plastic baggie with approximately 100 smaller ziplock bags with a blue devil symbol. These 100 smaller ziplock baggies contained a total of approximately 12.4 grams of crack cocaine. Investigators photographed the contents of the shoe box and collected the crack cocaine.

99.    In the bedroom agents located a 5-gallon bucket containing a digital scale with powder residue, an electric mixer, a Pyrex-type measuring cup with powder residue, small ziplock baggies, and a dinner plate.   Agents' search of the bedroom's closet revealed four additional 5-gallon buckets, one of which contained narcotic paraphernalia such as ziplock baggies have markings of a blue devil, and a baggie containing empty capsules.  Investigators photographed the contents of the buckets.

35

100.    During the search agents also located five aerosol cans of odor disinfectant scattered throughout the premises, which they photographed.

## II.    Defendant Summaries

### A.    Rondell FREEMAN, aka "Nightfall," "Fall"

101.    FREEMAN is discussed throughout this Affidavit. FREEMAN has been arrested several times in or around the 714 Division and 1230 Burling buildings. For example, on December 30, 1998, CPD officers responded to a call stating that drug sales were occurring out of a grey four-door Chevy located at the 714 Division building. Officers then found a grey, four-door Chevy just outside the 714 Division building, and observed Rondell FREEMAN in the car and Lonnie MACK nearby. Officers stopped the car and conducted a protective pat down of FREEMAN, during which they recovered $520 in cash. As this was occurring, FREEMAN became angry and began to yell gang slogans and scream for other GD members to help him. Officers reported that FREEMAN's actions caused a large crowd to gather, at which time officers arrested FREEMAN for disorderly conduct. Officers seized FREEMAN's cash for forfeiture after a narcotics detection dog indicated positively for the presence of drugs on the money. Officers also arrested MACK after he was found to be in possession of 3 baggies of cannabis. The cases on FREEMAN and MACK were later dismissed.

102.    On February 8, 2005, CPD arrested FREEMAN near the 1230 Burling building after they observed him run a stop sign and noted several "bootleg" CDs inside his car. FREEMAN was the only person in the car. A subsequent search of the vehicle revealed a hidden "trap" compartment containing a loaded Smith and Wesson pistol, and a cellophane-wrapped package of small ziplock baggies with blue devil markings containing a total of approximately 48.6 grams, of which only 15.3

36

were tested and found to be cocaine. In December 2005, FREEMAN was convicted of in this case of possession of 15+ grams of cocaine, and sentenced to 24 months felony probation.[31]

**B.    Brian WILBOURN, aka "Stay High," "3"**

103.    As outlined in paragraphs 44, 48-49, 54-57, 64, 68-71, 78-85, and 88-95, Brian WILBOURN was intercepted at the Target Unit preparing and packaging drugs for resale. In addition, 48 grams of crack cocaine and 23 grams of heroin were recovered from Wilbourn on April 11, 2006.

104.    CW1 and CW4 have related that WILBOURN's nickname is "Stay High." CW4 has also related that WILBOURN's nickname is "3". Additionally, both CW1 and CW4 knew WILBOURN to sell drugs on behalf of FREEMAN's drug trafficking organization at the 714 Division and 1230 Burling buildings and to be an "overseer" there, meaning he supervised sellers who worked in the buildings, collected money from them, and resupplied them with FREEMAN's drugs.

105.    On October 27, 2006 at 6:00 p.m., Rondell FREEMAN received a call over Target Phone 6 from a juvenile male (Call # 6383). During this call FREEMAN stated, "Bob gonna tell you to give Stay High that money. He gonna come over there." The juvenile asked, "All right. He's gonna bring that?" FREEMAN answered, "I gotcha, nigga."

106.    Based on my training and experience, as well as me knowledge of this investigation,

---

[31] The Illinois State Police Crime Lab, which tests drugs recovered by the Chicago Police Department for cases prosecuted in the Circuit Court of Cook County, does not test for the presence of cocaine base– only cocaine. Similarly, the Illinois Criminal Code does not distinguish between cocaine and cocaine base/crack cocaine for charging purposes. Consequently, when summarizing each defendant's state arrest and conviction history in the 714 Division and 1230 Burling buildings, this Affidavit notes that certain recoveries or convictions were for cocaine, and not cocaine base in the form of crack cocaine, only because the drugs were not tested for cocaine base and because the Illinois Criminal Code does not distinguish between cocaine and cocaine base/crack cocaine. Where drugs recovered as part of this case have been tested for cocaine base, I have so noted.

I believe that in this call FREEMAN informed the juvenile that he should provide Brian WILBOURN with money collected from the sale of narcotics ("Bob gonna tell you to give Stay High [Brian WILBOURN] that money. He gonna come over there."). I also believe that in this call FREEMAN informed the juvenile that WILBOURN would be delivering the crack cocaine (juvenile: "He's gonna bring that?" FREEMAN: "I gotcha, nigga.").

107.    Surveillance footage from this date at the Target Complex revealed that at 6:18 p.m., a white Lexus coupe that agents have observed WILBOURN driving on several occasions arrived at the Target Complex's southwest parking lot and parked near the assigned parking spot for the Target Unit.

108.    At 6:28 p.m., FREEMAN received a call over Target Phone 6 from Reginald BOOKER, who was using Target Phone 7 (Call # 6415).[32] During this call FREEMAN asked, "Where [is the juvenile male] at?" BOOKER responded, "hollering at 3."

109.    Based on my training and experience, as well as me knowledge of this investigation, namely WILBOURN's Lexus coupe arriving at the Target Complex, I believe that WILBOURN retrieved a package of crack cocaine from the Target Unit. I also believe that in Call # 6415 BOOKER informed FREEMAN that WILBOURN was delivering a package of drugs to the juvenile male ("hollering at 3 [Brian Wilbourn].").

1.    **Brian WILBOURN's Arrest History at the 714 Division and 1230 Burling Buildings**

110.    On January 15, 1997, CPD officers executed a search warrant at apartment 507 in the 714 Division building. While executing the warrant, officers discovered WILBOURN and a female in a bedroom within the apartment. Officers searched the bedroom and found three plastic bags,

---

[32] BOOKER's voice identification is discussed in footnote 40.

each containing smaller bags of cocaine, and numerous live rounds of ammunition. A search of WILBOURN yielded $305 cash. This case was later dismissed.

111.    On January 11, 1999, CPD officers received information from a cooperating individual that narcotics and guns were being stored in apartment 401 at the 1230 Burling building. Officers relocated to the apartment, spoke with the leaseholder, and searched the apartment. Among the items recovered included 303 multi-colored packs containing cocaine, $658 cash, and a State of Illinois identification card in the name of Brian WILBOURN. This case was later dismissed.

112.    On November 16, 2000, CPD officers arrested Brian WILBOURN at the 714 Division building after they observed him attempt to flush a plastic bag containing ziplock bags of cocaine down a toilet. In September 2002, WILBOURN was convicted of possession of a controlled substance and sentenced to 2 years' felony probation.

113.    On March 11, 2002, CPD officers arrested WILBOURN at the 1230 Burling building after they observed him shove a plastic bag containing smaller ziplock bags of cocaine into a mail slot. In February 2003, WILBOURN was convicted of possession of 15+ grams of cocaine, and sentenced to 10 years' imprisonment.

C.    **Adam SANDERS, aka "Redman"**

114.    Both CW1 and CW4 have stated that Adam SANDERS's nickname is "Redman." Both know SANDERS to sell FREEMAN's drugs in the 714 Division and 1230 Burling buildings, and to be an overseer for FREEMAN at those locations.

115.    On October 20, 2006 at 6:30 p.m., Rondell FREEMAN called Adam SANDERS over Target Phone 6 (Call # 5503).[33] During this call FREEMAN asked, "…how was you going to run

---

[33]   SANDERS's voice was identified during the traffic stop that occurred on November 13, 2006, described in paragraphs 127-129, and compared to the voice in this call.

the envelopes, and now you're asleep now?" SANDERS answered, "'Cause it coming right now, man. He was finna let me see his car." FREEMAN later replied, "Uh uh, Redman. Come on, man. This is biz."

116.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call FREEMAN wanted SANDERS to provide him with money collected from the sale of narcotics ("...how was you going to run the envelopes and now you're asleep now? ...Uh uh, Redman. Come on, man. This is biz.").

117.    On October 23, 2006 at 5:03 p.m., Rondell FREEMAN called Adam SANDERS over Target Phone 6 (Call # 5659) and asked, "What Bob went and gave you? Three dollars, right?" SANDERS answered, "No. Bob gave me four-, fourteen ninety-five..." FREEMAN replied, "Ok, and what Duke and them give you... They gave you three dollars right?" SANDERS replied, "Yea." FREEMAN then asked, "So, what? Why Duke, why he only gave you three dollars?" SANDERS replied, "That's all they had..." FREEMAN stated, "It was supposed to have been ... are you listening?" SANDERS answered, "Five, right?" FREEMAN answered, "Exactly." Seconds later FREEMAN asked, "You got a car?" SANDERS answered, "Yea. I can get..." FREEMAN replied, "'Cause I got to give these caps to them right quick." SANDERS asked, "...Are you up there already...You up there?" FREEMAN answered, "...I can meet you all right there by, uh, meet them by the North Avenue, by the gas station."

118.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 5659 SANDERS informed FREEMAN that he had collected $1495 from Reginald BOOKER for narcotics which had previously been provided to SANDERS ("No. Bob gave me four-, fourteen ninety-five..."), and $3,000 from Deshawn SIMMONS ("Why Duke, why he only

40

gave you three dollars?"),[34] and that SIMMONS owed $5,000 for previously fronted narcotics (SANDERS answering, "Five, right?" after FREEMAN stated, "It was supposed to have been..."). I further believe that in this call FREEMAN wanted to meet with SANDERS and other members of the FREEMAN drug trafficking organization so that FREEMAN could supply them with capsules of heroin at the BP Amoco gas station located at Clark and LaSalle in Chicago ("Cause, I got to give these caps to them right quick...I can meet you all right there by, uh, meet them by the North Avenue, by the gas station.").

119.    On October 24, 2006 at approximately 12:36 a.m., Adam SANDERS called Rondell FREEMAN over Target Phone 6 (Call # 5700). During this call FREEMAN asked, "Who you was with?" SANDERS answered, "...I was with LA and [Individual M], man." FREEMAN replied, "They the phoniest ones, man." SANDERS answered, "I already know, man." SANDERS then related, "... [Individual M] asked me, 'So the end can come in here and serve...it's all good for them...do their thing?'" FREEMAN stated, "They bitches. I can't wait and beat this case. I'm come hold, I'm come hold down...the shorties...up there ...Those niggas cowards...Everybody do what the fuck they want, man." FREEMAN continued, "Lets just say, for instance, when you was locked up...You ain't get no money orders. But all them niggas in there doing what the fuck they doing. [Individual K] know that. [Individual L] know that. LA know that. [Individual M] know that...why you couldn't get twenty-five dollars from each one, motherfucker?"

120.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 5700 SANDERS informed FREEMAN that he had spoken with Lance OLDEN earlier ("I was with LA"), and that Individual M had asked why gang members from the

---

[34] Deshawn SIMMONS's use of the nickname "Duke" was discovered when he used it in reference to himself during Call #4557, described in paragraph 182.

Cabrini Row Houses were selling drugs at the 1230 Burling building ("[Individual M] asked me, 'So

the end can come in here and serve…it's good for them…do their thing?'"). I believe FREEMAN

stated that after his criminal case was dismissed, he planned to commit acts of violence against his

drug workers for their lack of loyalty ("They bitches. I can't wait and beat this case. I'm come hold,

I'm come hold down…the shorties…up there.").[35]  I also believe that FREEMAN explained that

when SANDERS was imprisoned, his drug associates, including Lance OLDEN, ("LA know that.")

failed to send money to SANDERS ("…when you was locked up…why couldn't get twenty-five

dollars from each one motherfucker?").[36]

     121.    Seconds later in the same telephone call SANDERS stated, "They say we gonna talk

to them calm, right.  Talk to the…not supposed to be in here…tell them….there ain't no

more…Man, I say that shit is over with. It's too late. You all let them in. Now, we got to be

aggressive. Now we got to slap the shit out of one of them…." FREEMAN replied, "…them

bitch-ass niggas don't want no trouble ... That's what a motherfucker got to do, beat a nigga's ass,

your own guys…Mistreat them…" SANDERS stated, "When Bob, like we just going to continue,

do it like, when Bob get up there everybody move out the way. When he leaves, you all do what you

all want to do, man." FREEMAN stated, "That's why I want you to be watching them shorties.

Make sure they ain't go nowhere. And you stay your ass out there."

     122.    Based on my training and experience, as well as my knowledge of this investigation,

I believe that SANDERS told FREEMAN that his drug sellers wished to speak with the drug dealers

---

[35]  At the time of this call, FREEMAN had a criminal case pending in the Circuit Court of Cook County for possession of a controlled substance and unlawful use of a weapon by a felon.  FREEMAN was later convicted in this case, and was sentenced to six years' imprisonment.

[36]  Both CW1 and CW4 have stated that Daniel HILL's nicknames are "Little Burling" and "Little B."

who were not part of FREEMAN's drug trafficking organization ("They say we gonna talk to them calm, right ... Talk to the...not supposed to be in here..."), and ask them to leave the 1230 Burling building ("...tell them...there ain't no more..."). I believe SANDERS further stated that members of FREEMAN's drug trafficking organization needed to commit violence against drug dealers who were not part of FREEMAN's operation ("Now, we got to be aggressive. Now we got to slap the shit out of one of them..."). I also believe that FREEMAN suggested committing acts of violence against his own drug workers ("That's what a motherfucker got to do, beat a nigga's ass, your own guys...Mistreat them..."), and instructed SANDERS to continue overseeing the activities of FREEMAN's drug workers to make sure they were staying loyal to him ("That's why I want you to be watching them shorties...you stay your ass out there.").

123.    On October 29, 2006 at 11:39 a.m., Rondell FREEMAN called Adam SANDERS over Target Phone 6 (Call # 6933). During this call FREEMAN asked, "Hey, where those shorties at?" SANDERS answered, "...I already got them. They already on the set." FREEMAN then asked, "Hey, what's up with Bob, man...?" SANDERS answered, "...he still holding." FREEMAN then instructed SANDERS, "Tell him to put it out there." SANDERS replied, "That's what I told him."

124.    Based on my training and experience, and my knowledge of this investigation, I believe that in this call FREEMAN asked SANDERS for a status update on his drug workers, including Reginald BOOKER ("Hey where those shorties at?" "Hey, what's up with Bob, man...?"). I also believe SANDERS related that he had instructed FREEMAN's drug workers to start their shift selling narcotics at the 1230 Burling building (FREEMAN:"Tell him to put it out there." SANDERS:"...I already got them. They already on the set.").

125.    On November 2, 2006 at 10:47 p.m., Adam SANDERS called Rondell FREEMAN

43

over Target Phone 6 (Call # 7651). During this call SANDERS asked, "You gonna come back?"
Rondell FREEMAN replied, "What?" SANDERS stated, "I need that toy." FREEMAN asked,
"What happen?" SANDERS replied, "I ain't even going to say his name." FREEMAN asked,
"Who?" SANDERS answered, "...you need to come back this way. I can't find Little B or nobody."
FREEMAN then asked, "You getting ready to ski somebody?" SANDERS replied, "Yea."
FREEMAN asked, "Where Little B and them at?" SANDERS stated, "G, see nobody be around
though." FREEMAN asked, "You want me to chirp Little B?" SANDERS replied, "Yea, tell him
what I said."

126.    Based on my training and experience, and my knowledge of this investigation, I
believe that in this call SANDERS stated that he needed FREEMAN's gun ("I need that toy.") to use
on someone (FREEMAN: "You getting ready to ski somebody?" SANDERS: "I ain't even going
to say his name."). I also believe that SANDERS complained to FREEMAN that nobody was in
the building to help him ("G, see nobody be around though."), and asked FREEMAN to call Daniel
HILL for help (FREEMAN: "You want me to chirp Little B?" SANDERS: "Yea, tell him what I
said.").

1.    **November 13, 2006 Recovery of 77 Grams of Crack Cocaine from Adam
      SANDERS**

127.    On November 13, 2006, agents surveilling the Target Complex observed a Dodge
Intrepid registered to a woman believed to be Brian WILBOURN's mother parked in the assigned
parking spot for the Target Unit.[37] At approximately 8:40 p.m., three black males, one of whom

---

[37]  Agents believe the woman to whom the car was registered is WILBOURN's mother because WILBOURN listed
the same woman as his mother in his visitor's list when he was incarcerated at an Illinois Department of Corrections
("IDOC") prison.

resembled Brian WILBOURN, walked from the Target Complex's service door and got into the Intrepid.

128.    Agents followed the Intrepid as it drove directly to the BP Amoco gas station at Clark and LaSalle in Chicago, where it stopped parallel to a waiting Buick. Adam SANDERS exited the rear of the Buick and walked directly to the front passenger side of the Intrepid, where he leaned in and remained there for approximately 10 seconds.[38] SANDERS then returned to the Buick, sat in the backseat, and began moving his arms in such a manner as to make it appear that he was manipulating an area near the car floor. The Buick, which was registered to Syble MCCLUTCHEY, departed from the gas station and traveled west on North Avenue.

129.    At approximately 8:56 p.m., CPD officers stopped the Buick near the intersection of Larrabee and Clybourn Avenues, two blocks away from the 1230 Burling building. Officers approached the car and observed SANDERS sitting alone in the backseat. They removed him from the car, and after smelling a strong odor of crack cocaine, searched the Buick's backseat. Officers then recovered a black plastic baggie from underneath the front passenger seat. Inside the black baggie were 404 small ziplock baggies with blue devil markings, each containing a white rock-like substance of suspect crack cocaine; 120 ziplock baggies with an orange stripe marking, each containing a white rock-like substance of suspect crack cocaine; and 1 baggie containing approximately 18 grams of a large rock-like substance of suspect crack cocaine. Subsequent laboratory analysis disclosed the substances to total approximately 77 grams of cocaine base in the form of crack cocaine. Officers later released SANDERS after he arranged to have two firearms, a Beretta .22 caliber pistol and a Star 9 millimeter pistol, turned over to the police.

---

[38]  Agents identified SANDERS after having previously viewed a CPD booking photo of him.

2.    **Adam SANDERS's arrest history at the 1230 Burling building**

130.    On January 11, 2005, CPD officers arrested SANDERS at the 1230 Burling building after observing him throw to the ground a plastic bag containing approximately 110 smaller bags of cocaine. In March of 2005, SANDERS was convicted of manufacture/delivery of cocaine and sentenced to 1 year of imprisonment.

131.    On November 28, 2005, CPD officers arrested SANDERS at the 1230 Burling building after they observed him drop a plastic bag containing approximately 99 capsules of heroin. In April 2006, SANDERS was convicted of possession of a controlled substance and sentenced to 3 years of imprisonment.

132.    On January 24, 2007, CPD officers arrested SANDERS at the 1230 Burling building after they observed him drop a plastic bag containing approximately 155 smaller bags of cocaine and 6 smaller bags of heroin. In April 2007, SANDERS was convicted of possession of a controlled substance and sentenced to 1 year of imprisonment.

**D.    Daniel HILL, aka "Little Burling," "Little B"**

133.    Daniel HILL was captured on audio and video in the Target Unit as described in paragraph 74.

134.    Both CW1 and CW4 know Daniel HILL's nicknames to be "Little Burling" and "Little B." CW4 related that HILL sold FREEMAN's drugs in both the 714 Division and 1230 Burling buildings, and that HILL was an overseer for FREEMAN at those locations. CW1 knew HILL to have sold drugs in the 1230 Burling building, and to have been an overseer there.

135.    Additionally, on October 25, 2006 at 12:40 a.m., Daniel HILL called Target Phone

6 (Call # 5792).[39] During this call Rondell FREEMAN asked, "What, you in for the night?" HILL answered, "Naw, I finna ta slide back to the building, like, in thirty minutes." FREEMAN asked, "It be quiet in town?" HILL answered, "Kind of."

136. Based on my training and experience and my knowledge of this investigation, I believe FREEMAN asked HILL if he was at home ("What, you in the for the night?"). I believe that HILL answered he would be returning to the 1230 Burling building in thirty minutes ("Naw, I finna ta slide back to the building like in thirty minutes."). I also believe FREEMAN asked HILL, who was one of his building's overseers, whether there were any police activities or other events occurring which would disrupt the sale of narcotics ("It be quiet in town?").

137. On October 27, 2006 at 9:40 p.m., Daniel HILL called Reginald BOOKER over Target Phone 7 (Call # 5424).[40] During this call BOOKER asked, "Are they in the building?" HILL answered, "They got their car parked in the back like a regular car." BOOKER replied, "All right, copy that."

138. Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 5424 HILL alerted BOOKER that the police were at the 1230 Burling building ("They got their car parked in the back like a regular car.").

139. At 10:30 p.m. on this date, Reginald BOOKER used Target Phone 7 to call Daniel HILL (Call # 5569). During this call HILL asked, "Hey, what's going on?" BOOKER replied, "Shit, the law went and got money's crib." HILL responded, "Was there something in there?" BOOKER stated, "I don't even know. I don't think so... I be waiting on them to leave out

---

[39] Agents were familiar with HILL's voice from having observed and heard him in the Target Unit.

[40] Agents were familiar with Booker's voice from talking with him during the traffic stop that occurred on August 9, 2006. See paragraphs 154-165.

now…they still in this mother fucker." HILL then said, "I'm on my way over there then."

140.    Based on my training and experience, and my knowledge of this investigation, I believe that in this call HILL asked BOOKER whether the police were present at the 1230 Burling building ("Hey, what's going on?"). BOOKER then informed HILL that the police were searching an apartment unit ("Shit, the law went and got money's crib."). I also believe that HILL asked BOOKER if the police had seized any contraband ("Was there something in there?"). HILL then informed BOOKER that he planned to return to the 1230 Burling building ("I'm on my way over there then.").

141.    On October 30, 2006 at 4:07 p.m., Rondell FREEMAN used Target Phone 6 to chirp Daniel HILL (Call # 7160). During this call Rondell FREEMAN stated, "Your little ass hot, boy." HILL chirped back in Call # 7161, "I know." FREEMAN then stated, "You want to be a leader? Now you the leader, nigga …You wanted to be the boss? Now, you're the boss." HILL answered, "Get the fuck out of here, man." FREEMAN then jokingly stated, "…tell the 18th district that I got to go through you to even come over there."

142.    Based on my training and experience, and my knowledge of this investigation, I believe that in Calls 7160 and 7161 FREEMAN told HILL he had been receiving a lot of attention from the police ("Your little ass hot, boy."). I also believe FREEMAN joked that HILL was now experiencing what it meant to be a gang leader ("You want to be a leader? Now you the leader, nigga … You wanted to be the boss? Now you're the boss.").

143.    On November 3, 2006 at approximately 8:28 p.m., Daniel HILL chirped Rondell FREEMAN over Target Phone 6 (Call # 7773). During this call Rondell FREEMAN asked, "What you on, nigga?" HILL answered, "Shit, tired of sitting by the building." FREEMAN then asked, "It

48

is your day, right?" HILL replied, "Yea."

144.    Based on my training and experience, and my knowledge of this investigation, I believe that in this call HILL informed FREEMAN that he was working as a building overseer (HILL: "Shit, tired of sitting by the building." FREEMAN: "It is your day, right?").

### 1.    Purchase of 12 Grams of Crack Cocaine from Daniel HILL

145.    On July 2, 2007, investigators met with CW4 to arrange for the controlled purchase of crack cocaine from Daniel HILL. Before the transaction, agents searched CW4 and his/her car for the presence of drugs and excess cash, with negative results. Agents then outfitted CW4 with a body-recording device, and followed CW4 as s/he drove to a parking lot east of the 1230 Burling building. After a few minutes agents observed CW4 exiting a black Monte Carlo. Agents have observed HILL driving this Monte Carlo during the investigation. The recording of the meeting revealed that the following exchange occurred between CW4 and HILL in the Monte Carlo[41]:

| | |
|---|---|
| CW4: | Hey, what's a half going for? What's a half going for? |
| HILL: | For what? crack? |
| CW4: | Yea. |
| HILL: | Three-fifty |
| | … |
| CW4: | You got one though? |
| HILL: | Naw, I can get it though if you need it. |
| CW4: | So when? tomorrow? |
| HILL: | I can get for you. Probably have it tonight. |

---

[41]  Agents were familiar with HILL's voice from previously having seen and heard him within the Target Premises. See paragraph 74.

CW4:        How long? Cause I can't be outside too late.

HILL:       If I have it tonight and you ain't out here, I'll have it for you in the morning.

146.    Following this conversation, CW4 then left the parking lot and met with agents, who recovered the recording device from CW4. CW4 informed agents that s/he had met with HILL in his car, and that HILL had agreed to sell him/her ½ ounce of crack cocaine the following day.

147.    The next day, July 3, 2007, agents again met with CW4 and searched him/her and his/her car for illegal drugs and excess cash, with negative results. Agents then outfitted CW4's car with an audio/video recording device, and provided him/her with $500. Agents once again followed CW4 to a parking lot east of the 1230 Burling building, where they observed him/her meet with Daniel HILL. The meeting lasted approximately a minute, and the recording demonstrated that the following exchange occurred:

CW4:        I got 350 for you.

HILL:       Just give it to me. Give me like 30 minutes, I'll make the call.

Agents then observed HILL exit CW4's car and walk to the front of the 1230 Burling building, where he began using a cell phone. HILL then entered the 1230 Burling building. Approximately 3 hours later, agents observed HILL return to the parking lot, where he met with CW4. The video reveals that during this meeting, HILL pulled out a package of crack cocaine from his pocket and handed it to CW4.

148.    Following his/her meeting with HILL, CW4 met with agents and provided them with a clear plastic baggie containing 12 grams of cocaine base in the form of crack cocaine, and $150 (the remaining cash). Investigators then searched CW4 and his/her car for drugs and excess cash, with negative results.

50

### 2.    Daniel HILL's arrest history at the 1230 Burling building

149.    On July 23, 2005, CPD officers observed HILL attempting to excite a large crowd which was located in a parking lot of 1230 Burling building. Officers reported that HILL stated, "Fuck the police. I'll kick all your asses. I'll kill the police. The police ain't shit." A foot pursuit then ensued, during which HILL knocked an officer to the ground in an effort to avoid being placed into custody. Officers ultimately apprehended HILL and charged him with aggravated assault, battery, and resisting/obstructing a peace officer. In October of 2005, HILL was convicted of aggravated assault and resisting/obstructing a peace officer and sentenced to a term of conditional discharge.

150.    On December 19, 2005, CPD officers arrested HILL after they observed him at the 1230 Burling building holding a plastic bag containing approximately 56 smaller bags of cocaine. In August 2006, HILL was convicted of possession of a controlled substance and sentenced to 24 months' felony probation and 30 hours of community service.

### E.    Robert FREEMAN

151.    Robert FREEMAN was intercepted within the Target Unit following his purchase of a firearm for Rondell FREEMAN, and helping Brian WILBOURN and Senecca WILLIAMS cook powder cocaine into crack, as outlined in paragraphs 60-61, 64, 66-67, 72-73, 75-76, and 80-81. Both CW1 and CW4 know Robert FREEMAN's nickname to be "G-Rob," and know him to be Rondell FREEMAN's cousin.

### 1.    Robert FREEMAN's Arrest History at the 1230 Burling Building

152.    On April 9, 1999, CPD officers arrest Robert FREEMAN at the 1230 Burling building after a confidential informant provided them information about a man selling drugs there

51

on an upper floor. Officers then relocated to the 14th floor of the building and saw FREEMAN. As they approached him, he ran into apartment 1405. Officers pursued FREEMAN into the apartment, and once inside, conducted a protective pat-down search of him. This search yielded 38 smaller clear plastic bags of cocaine. In February 2002, FREEMAN was found not guilty of the charges in this case.

### F.    Reginald BOOKER, aka "Bob," and Syble MCCLUTCHEY, aka "Silver"

153.    Both CW1 and CW4 have stated that Reginald BOOKER's nickname is "Bob," and Syble MCCLUTCHEY's nickname is "Silver." Both CWs have also stated that the two sell FREEMAN's drugs at the 1230 Burling building.

154.    On August 9, 2006 at approximately 7:43 p.m., agents observed a Chevrolet Lumina arrive at the Target Complex and park in the assigned parking spot for the Target Unit. Surveillance video footage revealed that at approximately 7:46 p.m., Rondell FREEMAN and Senecca WILLIAMS entered the condominium complex through the service door.

155.    At 9:35 p.m. that night, Syble MCCLUTCHEY used Target Phone 7 to chirp Rondell FREEMAN over Target Phone 4 (Call # 5592). During this call MCCLUTCHEY stated, "Come holler at me."[42] MCCLUTCHEY then again used Target Phone 7 to chirp FREEMAN over Target Phone 4 in Call #5595 and asked, "You heard me, nigga?" FREEMAN replied, "Yea. I'm finna be en-route ... You got a ride?" MCCLUTCHEY answered, "Yea."

156.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 5592 MCCLUTCHEY asked FREEMAN to supply her with a package of narcotics ("Come holler at me."). I also believe that in Call # 5595 FREEMAN informed

---

[42]  MCCLUTCHEY's voice was identified later that night during the traffic stop of her and REGINALD BOOKER.

MCCLUTCHEY that he would ("Yea. I'm finna be en-route.").

157.   At 10:07 p.m. that night, Rondell FREEMAN used Target Phone 4 to chirp Target Phone 7 (Call # 5607).  Reginald BOOKER answered the phone and asked, "What?"  Rondell FREEMAN stated, " Tell her to come on then, now.  I'm ready.  I'm finna ta meet her…"

158.   Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 5607 FREEMAN was stating that he was ready to meet with MCCLUTCHEY and supply her with drugs (" Tell her to come on then, now.  I'm ready.  I'm finna ta meet her.").

159.   At 11:04 p.m. on this same date, Syble MCCLUTCHEY used Target Phone 7 to chirp FREEMAN over Target Phone 4 (Call # 5609).  During this call Rondell FREEMAN stated, "I say, that [Individual D] was gonna give you that money, and I was finna meet you."  MCCLUTCHEY asked, "Where you finna meet me at?"  FREEMAN answered, "Around the way."

160.   Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 5609 FREEMAN instructed MCCLUTCHEY to meet with Individual D and collect money earned from the sale of narcotics ("I say that [Individual D] was gonna give you that money.").  I also believe that FREEMAN stated he planned to meet with MCCLUTCHEY ("I was finna meet you.") away from the 1230 Burling building ("Around the way.").

161.   At 11:08 p.m. on that same date, Syble MCCLUTCHEY used Target Phone 7 to chirp Rondell FREEMAN over Target Phone 4 (Call # 5611).  During this call Rondell FREEMAN asked, "You holler at him?"  Syble MCCLUTCHEY answered, "Yeah, I'm on my way."

162.   Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 5611 MCCLUTCHEY informed FREEMAN that she had met with Individual D and received money collected following the sale of narcotics.

163.     At approximately 11:15 p.m., surveilling agents observed Rondell FREEMAN exit the Target Complex through the service door and enter the Chevrolet Lumina.  FREEMAN then drove southbound on Lake Shore Drive.  As agents followed FREEMAN, Reginald BOOKER used Target Phone 7 to chirp Rondell FREEMAN over Target Phone 4 (Call # 5613) at 11:21 p.m. During this call FREEMAN asked, "Hey, where she at?"  BOOKER answered, "I'm waitin' on her to come down with the key. Here she go right here."

164.     At approximately 11:26 p.m. FREEMAN pulled over into an emergency parking area just north of the North Avenue exit of Lake Shore Drive south.  At approximately 11:33 p.m., CPD officers observed BOOKER driving a maroon Ford Expedition with MCCLUTCHEY in the passenger seat. The two departed from the parking lot of the 1230 Burling building and traveled northbound on Halsted Avenue until officers stopped them near the intersection of Halsted and North Avenues.  After learning that BOOKER did not have a valid driver's license or insurance, officers instructed the two to get out of the car, which they then searched.  Officers recovered from the front passenger seat $192 in cash that they had observed MCCLUTCHEY counting, along with a black plastic bag containing an additional $965 cash from underneath the passenger seat.  Officers then asked BOOKER if he had anything on him, and he answered, "Cash."  Officers then recovered $444 cash from BOOKER's pants pocket. All of the recovered cash was in small denominations, which I know, based on my training and experience, to be consistent with money collected from numerous individual narcotics sales.    After recovering the cash, officers released BOOKER and MCCLUTCHEY.

165.     Immediately following their release, at approximately 11:37 p.m., Syble MCCLUTCHEY used Target Phone 7 to chirp Rondell FREEMAN over Target Phone 4 (Call #

54

5615). MCCLUTCHEY stated, "They just stopped us. They got the mother-fucking money ... The money was under the seat. They like, 'get back in the car and get your IDs, man,' and they just sent us all off."

166.    At approximately 11:50 p.m., agents observed the Chevrolet Lumina FREEMAN had been driving return to the parking spot assigned to the Target Unit.

167.    Additional phone calls of Reginald BOOKER are discussed throughout this Affidavit. See paragraph 12 for a full list of cites to those calls.

### 1.    Reginald BOOKER's Arrest History at the 1230 Burling Building

168.    On March 11, 2007, CPD officers received information that a black male nicknamed "Bob" was selling crack cocaine from the rear bedroom of apartment 706 at the 1230 Burling building. Officers traveled to apartment 706 and obtained from the leaseholder written consent to search the apartment. Officers then entered a rear bedroom and observed BOOKER jump up from the bed and place his hands in his pockets. When officers searched BOOKER's pocket they found one clear bag containing 60 smaller baggies of cocaine, 30 capsules of heroin, and a bundle of cash totaling $163. Officers searching the bedroom recovered 33 baggies of cannabis and 400 small baggies of cocaine, along with a bundle of cash totaling $2,479. BOOKER has since been charged with manufacture/delivery of cocaine, manufacture/delivery of heroin, and manufacture/delivery of cannabis. This case is still pending.

169.    On July 11, 2007, CPD officers arrested BOOKER for soliciting unlawful business at the 1230 Burling building after they observed him waving and yelling "rocks and blows" at passing pedestrians. In August 2007, the case was dismissed.

### 2. Syble MCCLUTCHEY's Arrest History at the 1230 Burling Building

170.    On June 26, 2005, CPD officers executed a search warrant at apartment 604 of the 1230 Burling building. During their search officers recovered two small baggies of cannabis from a bedroom. After being *Mirandized* MCCLUTCHEY stated, "The weed you found was mine. I was going to smoke it in the tube. All that weed in my bedroom you found was for me to relax." A search of MCCLUTCHEY yielded $167 cash. MCCLUTCHEY then stated, "You're not going to find anything because I sold out last night. All I had was $50 dollars worth." MCCLUTCHEY was charged with possession of cannabis. The case was later dismissed.

### G. Senecca WILLIAMS, aka "Boo Boo"

171.    Senecca WILLIAMS was intercepted cooking powder cocaine into crack cocaine at the Target Unit as outlined in paragraphs 78-80, 82, 85-87.

172.    Both CW1 and CW4 have stated that Senecca WILLIAMS's nickname is "Boo Boo." CW1 has related that WILLIAMS sells FREEMAN's drugs at the 1230 Building, and has seen WILLIAMS selling drugs packaged in ziplock baggies with blue devil markings there.

173.    Additionally, on December 3, 2005 at approximately 7:34 p.m., surveillance footage from the Target Complex captured Senecca WILLIAMS exiting the complex carrying a white plastic trash bag. Approximately 6 ½ hours later, an agent recovered a bag of similar size and color from the Target Complex's trash dumpster, and found it to contain narcotic packaging paraphernalia, including ziplock baggies with a red apple logo.

174.    On October 26, 2006 at 8:24 p.m., Rondell FREEMAN used Target Phone 6 to chirp Target Phone 7 (Call # 6202). FREEMAN asked, "Hey, you busy man, you busy?" Senecca WILLIAMS answered, "Nah, man, I ain't busy, what's up?" FREEMAN replied, "Why would I be

56

calling you, then? Catch a cab, alright?" WILLIAMS answered, "Yeah."

175. Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call FREEMAN asked WILLIAMS if he would be available to assist in the preparation and packaging of narcotics ("Hey, you busy man, you busy? ... Why would I be calling you, then?"). I also believe that WILLIAMS agreed to assist FREEMAN.

176. At 10:26 p.m., FREEMAN used Target Phone 6 to chirp Senecca WILLIAMS (Call #6220). During this call WILLIAMS asked, "Where you at, man? I'm finna be on my way. What's up?" Rondell FREEMAN replied, "Hold on, man….I'm finna get headed that way…I'll meet you there at eleven thirty….Just holler at Robert, he should in the lobby." WILLIAMS answered, "All right[.]"

177. Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call FREEMAN informed WILLIAMS that he was en-route to the Target Unit and that he would meet WILLIAMS there at 11:30 p.m. ("…I'm finna get headed that way…I'll meet you there at eleven thirty…").

178. Surveillance footage from the Target Complex reveals that the next day, on October 27, 2006 at approximately 1:40 p.m., Rondell FREEMAN's black Range Rover arrived in the Complex's southwest parking lot and parked in the assigned parking spot for the Target Unit. The video further disclosed that Senecca WILLIAMS exited the Range Rover and walked towards the complex.

1. **Senecca WILLIAMS's Arrest History at the 1230 Burling Building**

179. On September 27, 1999, CPD officers arrested Senecca WILLIAMS in apartment 801 of the 1230 Burling building after officers observed him toss into a closet a plastic bag, later found

to contain several smaller bags of cocaine.  In August 2000, WILLIAMS was convicted of possession of a controlled substance and sentenced to 2 years' imprisonment.

180.    On January 28, 2000, WILLIAMS was arrested in apartment 801 of the 1230 Burling building after officers observed him putting together "blunts" of marijuana.  In August 2000, WILLIAMS was convicted of manufacture/delivery of cannabis and sentenced to 2 years' imprisonment.

### H.    Deshawn SIMMONS, aka "Duke"

181.    Both CW1 and CW4 have related that Deshawn SIMMONS's nickname is "Duke." Both have also related that SIMMONS sells FREEMAN's drugs at the 1230 Burling building.

182.    On July 22, 2006 at 11:19 p.m., Deshawn SIMMONS chirped Rondell FREEMAN over Target Phone 4 (Call # 4557).  SIMMONS stated, "I got that.  It's gone."  FREEMAN asked, "Who is this?" SIMMONS answered, "This Duke."  FREEMAN then asked, "You downstairs?" SIMMONS responded, "I'm in front of the building."  FREEMAN stated, "Here I come."[43]

183.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call SIMMONS stated that he had sold drugs previously supplied by FREEMAN ("I got that. It's gone.").  I also believe that FREEMAN stated he was going to meet SIMMONS at the 1230 Burling building (SIMMONS: "I'm in front of the building").

184.    On August 9, 2006 at approximately 10:03 p.m., Deshawn SIMMONS used Target Phone 7 to call FREEMAN over Target Phone 4 (Call # 5600).  During this call Rondell FREEMAN asked, "What's the deal?  So, so I know what to do, man?"  SIMMONS responded, "I got a deuce,

---

[43]   Deshawn SIMMONS is believed to be the "Duke" in this call based on agents' search of a CPD database that contains arrestee and contact card information which disclosed that in June 2006, SIMMONS provided CPD with a nickname of "Duke." Additionally, CW1 and CW4 have informed agents that "Duke" is SIMMONS's nickname.

man ... I'm almost finished." FREEMAN asked, "You got a duce left?" SIMMONS answered, " Yea, man." Shortly afterwards FREEMAN stated, "Silver gonna come holler at me, so I'm a send it back with her."

185.   Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call SIMMONS stated that he had a quantity of narcotics left to sell ("I got a deuce, man ... I'm almost finished." ).  I also believe FREEMAN stated he planned to give MCCLUTCHEY a supply of narcotics to provide to SIMMONS ("Silver gonna come holler at me. So, I'm a send it back with her.").

186.   At approximately 11:15 p.m., agents observed Rondell FREEMAN exit the Target Complex through the service door, enter a Chevrolet Lumina, and then drive southbound on Lake Shore Drive.  As described at paragraphs 154-166,  while FREEMAN drove to meet with MCCLUTCHEY, officers stopped her and Reginald BOOKER and seized $1601 in cash before FREEMAN met up with them.

187.   On October 23, 2006 at 5:03 p.m., Rondell FREEMAN used Target Phone 6 to call Adam SANDERS (Call # 5659).  During this call FREEMAN asked, "[W]hat Duke and them give you... They gave you three dollars right?" SANDERS replied, "Yea." FREEMAN then asked, "So, what? Why Duke, why he only gave you three dollars?" SANDERS replied, "That's all they had..." FREEMAN stated, "It was suppose to have been ... are you listening?" SANDERS answered, "Five, right?"  FREEMAN answered, "Exactly."

188.   Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call SANDERS stated that he had collected $3,000 from Deshawn SIMMONS ("Why Duke, why he only gave you three dollars?") and that SIMMONS owed FREEMAN $5,000

59

for previously fronted narcotics ("Five, right?").

189.    On October 27 at 2:22 p.m., Reginald BOOKER used Target Phone 7 to chirp Rondell FREEMAN over Target Phone 6 (Call # 6261). During this call FREEMAN asked, "What's up with them caps, man?" BOOKER answered, "Shit moving slow right now, man, its moving, moving slow." FREEMAN asked, "How many you got?" BOOKER answered, "I got like fifty of them. I was finna give Duke that, though." FREEMAN instructed, "Give that to Duke, man." BOOKER replied, "All right, man."

190.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call BOOKER stated that heroin sales were slow (FREEMAN: "What's up with them caps, man?" BOOKER: "Shit moving slow...") and that he had 50 capsules left to sell ("I got like fifty of them..."). I also believe FREEMAN instructed BOOKER to supply Deshawn SIMMONS with the remaining capsules to sell ("Give that to Duke, man.").

191.    On October 28, 2006 at 1:28 p.m., Rondell FREEMAN used Target Phone 6 to call Adam SANDERS (Call # 6705). During this call FREEMAN asked, "Hey, you ever holler at Duke?" SANDERS replied, "Yea, man, that bitch only gave me four hundred dollars..." FREEMAN then asked, "Is they out and about?" SANDERS answered, "Yea. I don't know." FREEMAN then stated, "I'm a make some 5-7, man. I'm trying to see."

192.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call SANDERS stated that he had collected $400 worth of drug money from Deshawn SIMMONS ("Yea, man, that bitch only gave me four hundred dollars..."). I also believe that FREEMAN planed to package capsules of heroin for SIMMONS to sell ("I'm a make some 5-7, man. I'm trying to see.").

60

### 1.   Deshawn SIMMONS's arrest history at the 1230 Burling building

193.   On January 9, 2006, CPD officers were walking on the 5th floor of the 1230 Burling building when they approached Deshawn SIMMONS for a field interview and observed him drop an object to the ground. Officers recovered the object, found it to be 4 baggies of cocaine, and arrested SIMMONS. This case was later dismissed.

194.   On June 21, 2006, officers observed Deshawn SIMMONS yelling "rocks" while standing in the lobby of 1230 Burling building. As officers approached SIMMONS, he yelled "be up" and "5-0." SIMMONS then turned and ran out the back of building. Officers caught up with SIMMONS and arrested him for soliciting unlawful business. This case was later dismissed.

195.   On February 2, 2007, CPD officers arrested Deshawn SIMMONS after they observed him standing in the lobby of the 1230 Burling building yelling "rocks" for several minutes. Officers then arrested SIMMONS for soliciting unlawful business, and a custodial search of SIMMONS's pocket revealed a clear plastic baggie containing 30 smaller baggies of cocaine. In October 2007, SIMMONS was convicted of controlled substance trafficking and sentenced to 18 months' felony probation.

### I.   Clint LINZY, aka "Big Shorty"

196.   Both CW1 and CW4 know LINZY to use the nickname "Big Shorty." CW1 knows LINZY to work as a lookout for FREEMAN's drug trafficking organization.

197.   On October 27, 2006 at 9:40 p.m., Clint LINZY chirped Reginald BOOKER over Target Phone 7 (Call #5557). LINZY stated, "They beating on the mother-fucking door."[44]

---

[44]   Clint LINZY's voice was identified after agents spoke with him on March 23, 2007 following a court appearance. During the interview LINZY identified himself by name, but denied that he was involved in a gang, and denied that his nickname was "Big Shorty." However, in Calls #5831 and #5832 from October 29, 2006, LINZY answered to the nickname "Big Shorty." Additionally, CW1 and CW4 have informed agents that LINZY's nickname is "Big

BOOKER replied, "See out the back, blue coats, Impalas, and they say that there are three Impalas on the front."

198.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call LINZY stated that the police were attempting to enter an apartment at the 1230 Burling building (blue coats "beating on the mother-fucking door").

199.    At 9:50 p.m. on this same date, LINZY again chirped BOOKER over Target Phone 7 (Call # 5558). LINZY stated, "They stopped beating on the door, but I don't know if they gone." BOOKER replied, "Them two blue coats leaving…see if that crown still in here."

200.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call LINZY stated he was not sure whether the police were still in the building ("They stopped beating on the door, but I don't know if they gone.").

201.    On October 28, 2006 at 12:47 a.m., approximately 3 hours after CPD officers began executing a search warrant (unrelated to this case) at the 1230 Burling building, Clint LINZY chirped Reginald BOOKER over Target Phone 7 (Call # 5598). LINZY asked, "Should we come back out or you need me to shut this motherfucker down?" BOOKER instructed, "Shut it down." "All right," LINZY replied.

202.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call LINZY asked if he and other drug workers should temporarily stop selling drugs at the 1230 Burling building ("Should we come back out or you need me to shut this motherfucker down?"). I also believe BOOKER instructed LINZY to temporarily stop selling narcotics ("Shut it down.").

---

Shorty."

203.    At 1:05 a.m. on that date, LINZY chirped Reginald BOOKER over Target Phone 7 (Call # 5599).  LINZY stated, "I'm gonna send [Individual H] up there to get a cap."  BOOKER replied, "Naw, I ain't up there. I finna come down in a minute."

204.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call LINZY stated that he was sending a drug worker to a higher floor in the 1230 Burling building to obtain a capsule of heroin from BOOKER ("I'm gonna send [Individual H] up there to get a cap.").

205.    On October 29, 2006 at 10:20 p.m., Clint LINZY chirped Target Phone 7, being used by Reginald BOOKER (Call # 5791).  During this call BOOKER asked, "Is it all good?" LINZY replied, "It's been all good, you scared bitch."

206.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call LINZY informed BOOKER that drug trafficking activities could take place, since police were not around ("Is it all good?").

207.    At 11:22 p.m. on that same date, Reginald BOOKER used Target Phone 7 to chirp Clint LINZY (Call # 5831).  During this call BOOKER asked, "Big Shorty, is it all good, man?" In the following call (Call # 5832), LINZY replied, "Yea, it's all good."

208.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call LINZY informed BOOKER that it was safe for drug trafficking activities to occur  ("Yea, it's all good.").

### 1.    Clint LINZY's arrest history at the 1230 Burling building

209.    On February 19, 2007, CPD officers were conducting a narcotics investigation in the 1230 Burling building.  Officers went to apartment 503, where they were met by LINZY who

answered the door. After explaining to LINZY why they were there, LINZY stated to the officers,

"Fuck you, you ain't getting in here." LINZY then pushed past officers, slammed the door shut, and

attempted to run. Officers apprehended LINZY and placed him under arrest for resisting/obstructing

a peace officer. In June of 2007, LINZY was found not guilty of the charge.

### J.    Darnell WILLIAMS, aka "Don D"

210.    Both CW1 and CW4 have stated that WILLIAMS's nickname is "Don D." Both have

also related that WILLIAMS sells FREEMAN's drugs at the 1230 Burling building, and both have

seen him selling drugs there packaged in baggies with a blue devil marking.

### 1.    Purchase of Crack Cocaine from Darnell WILLIAMS

211.    On September 8, 2005, CW1 purchased 2.3 grams of crack cocaine from Darnell

WILLIAMS. The crack was packaged in ziplock baggies with a blue devil marking. Before the

transaction, agents met with CW1 near the 1230 Burling building at approximately 8:10 p.m. and

searched him/her for the presence of drugs and excess cash, with negative results. Agents then

provided CW1 with $100 cash, and outfitted him/her with a transmitter and body-recording device.

212.    Surveilling agents next watched CW1 enter the 1230 Burling building. Then, agents

monitoring the transmitter overheard the following exchange:

| | |
|---|---|
| CW1: | Who up there? |
| Unknown: | Don D |
| | [CW1 walks up stairwell in building] |
| CW1: | Don D? Don D? |
| CW1: | You all got motherfuckers scared to come up here. |
| WILLIAMS: | I ain't scared. |

| | |
|---|---|
| CW1: | Naw, (unintelligible) |
| | [Sound of plastic baggie being handled] |
| WILLIAMS: | What they do? |
| CW1: | Whooped em. |
| WILLIAMS: | Oh, shit. |
| CW1: | Get, uh, uh, a hundred dollars (unintelligible), man. |
| WILLIAMS: | ...I mean, you got to keep it happening...I don't give a shit what they talking about, as long as they buying. |
| CW1: | Man, it's hot in here, in this motherfucker. |
| WILLIAMS: | You got to be sitting in here for a minute |

213.   CW1 then returned to agents and handed them 20 ziplock baggies with a blue devil marking, containing a total of 2.3 grams of crack cocaine. Agents again searched CW1 for excess cash or drugs, and found none.

214.   Agents debriefed CW1 following the deal. CW1 stated that s/he had purchased the crack cocaine from Darnell WILLIAMS, also known to CW1 as "Don D," and paid him $100. CW1 further stated that during the transaction s/he observed a handgun inside WILLIAMS's waistband. Agents subsequently compared the voice on this recording with another recording they had previously obtained of WILLIAMS on August 16, 2006, in which WILLIAMS was captured on audio and video speaking with CW1, and determined that the voices in the two recordings were the same.

215.   Approximately two weeks after the October 8, 2005 controlled purchase, surveillance footage from the Target Complex revealed that a black male resembling Rondell FREEMAN

discarded a white plastic bag into the Complex's trash dumpster, entered a vehicle parked in the assigned parking spot for the Target Unit, and left. Approximately 1 ½ hours later, an agent recovered a plastic bag of similar size and color to the one previously discarded. The bag contained narcotic packaging paraphernalia, as well as a torn piece of paper with the notation "Don D 2600." Based on my training and experience, as well as my knowledge of this investigation, I believe that this notation reflected a $2,600 drug debt owed by Darnell WILLIAMS to Rondell FREEMAN.

216.    On July 27, 2006 at 11:24 p.m., Reginald BOOKER used Target Phone 5 to chirp Rondell FREEMAN over Target Phone 4 (Call # 4944). BOOKER stated, "Here go [Individual D] right here." Seconds afterwards, a male believed to be Individual D spoke with Rondell FREEMAN over Target Phone 4 (Call # 4945) and stated, "Shit man, I know how to count ... I count that shit three times man." FREEMAN responded, "It was right. It was wrapped tight, not like it was touched." The male replied, "'Cause Don D gave me the money, man."

217.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call BOOKER informed FREEMAN that Individual D wanted to speak with him using BOOKER's phone ("Here go [Individual D] right here."). I believe that Individual D then stated that he had counted money collected from the sale of narcotics three times after having received it from Darnell WILLIAMS ("I count that shit three times, man ... 'Cause Don D gave me the money man").

### 2.    Darnell WILLIAMS's arrest history at the 1230 Burling building

218.    On April 10, 2001, CPD officers arrested Darnell WILLIAMS on the 11th floor of the 1230 Burling building after they observed him looking into a clear plastic bag containing

approximately 47 smaller bags of cocaine.   In June 2001, WILLIAMS was convicted of manufacture/delivery of cocaine, and sentenced to 24 months' felony probation.

219.    On April 5, 2003, CPD officers arrested Darnell WILLIAMS in apartment 702 of the 1230 Burling building after officers observed him holding a Lorcin .380 pistol.  In May 2003, WILLIAMS was convicted of aggravated unlawful use of weapon and sentenced to 3 years' imprisonment.

220.    On July 11, 2005, CPD officers arrested Darnell WILLIAMS after receiving information from a concerned citizen that narcotic sales were occurring in apartment 702 of the 1230 Burling building.  Officers went to the apartment and spoke with the leaseholder, who gave them consent to search the apartment.  Upon doing so, they found Darnell WILLIAMS and others sitting on a bed in a rear bedroom.  Officers recovered from Darnell WILLIAMS a large plastic baggie containing 100 smaller baggies of cocaine, and from the other occupants 8 small plastic ziplock baggies with a blue devil marking that contained cannabis.  Officers also recovered $3,627 in cash in various denominations.  In December of 2006, Darnell WILLIAMS was found not guilty of the charges relating to this arrest.

221.    On January 13, 2007, CPD officers observed WILLIAMS and others at the 1230 Burling building yelling "Be-Up," a code used to alert that police are nearby.  Officers conducted a field interview with WILLIAMS and learned that he did not live at the 1230 Burling building or have permission to be there, and arrested him for criminal trespass.  In January of 2007, WILLIAMS was convicted of criminal trespass and received a sentenced of time served.

On December 4, 2007, CPD officers arrested Darnell Williams in the 1230 Burling building after they observed him loitering.  They approached him for an interview, at which time he

fled. Officers caught up with Williams and arrested him for criminal trespass after they learned he did not live in the 1230 Burling building or have permission to be there (only CHA residents may be on CHA property without prior approval). During a custodial search officers found suspect crack cocaine on him.[45] Williams told officers, "I usually don't sell drugs, but it's Christmas time." This case is currently pending.

### K.    Marcell THOMAS, aka "Little Cell," "Cell"

222.    CW4 has stated that through his/her discussions with Rondell FREEMAN and other GD members, s/he learned that when Rondell FREEMAN moved his drug operation to the 1230 Burling building, FREEMAN assembled a crew of GD members to sell his drugs, including Marcell THOMAS (known to CW1 and CW4 as "Little Cell" or "Cell"). Both CW1 and CW4 have stated that they have seen THOMAS selling crack cocaine packaged in baggies with a blue devil marking at the 1230 Burling building.

223.    On June 5, 2006, agents observed Rondell FREEMAN arrive and park in the assigned parking spot for the Target Unit. FREEMAN then walked over to a waiting Chevy and spoke to someone in the car for a few seconds. FREEMAN next entered the Target Complex, and Brian WILBOURN then exited the Chevy and also entered the Target Complex. Approximately 30 minutes later, FREEMAN and WILBOURN exited the Complex. FREEMAN was carrying a white plastic trash bag, which he discarded into the trash dumpster. FREEMAN and WILBOURN then got into FREEMAN's car and drove away.

224.    Approximately two hours and fifteen minutes later, your Affiant found a trash bag similar in size and color to the one previously discarded by FREEMAN. It contained narcotic

---

[45] The lab report from this case is not yet available.

paraphernalia, such as empty Sleepinal and Dormin pill packaging and latex gloves. In addition, it contained torn pieces of paper with hand-written notations of names and numbers. Among these notations was one for "Cel 1500." Based on my training and experience, as well as my knowledge of this investigation, I believe that these torn pieces of paper were part of a drug ledger created by FREEMAN, and that "Cel 1500" reflected a $1500 drug debt owed by Marcell THOMAS. CW1 has informed agents that THOMAS's nickname is "Lil Cell" or "Cell."

225.    On October 27, 2006 at 9:53 p.m., a female chirped Reginald BOOKER over Target Phone 7(Call # 5559). The female asked, "Bob, you seen Cell?" BOOKER replied, "Cell in the house. The law up there right now."

226.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call BOOKER stated that the police were with Marcell THOMAS at his home ("Cell in the house. The law up there right now.").

227.    At 11:15 p.m. on that date, the same female chirped Reginald BOOKER over Target Phone 7(Call # 5587). BOOKER stated, "Shit, they just locked Cell up." The female asked, "What they lock him up for... he moved everything right?"

228.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call BOOKER stated that Marcell THOMAS had been arrested by the police ("Shit, they just locked Cell up."). I also believe that the female asked BOOKER if THOMAS, prior to being arrested, had hidden his narcotics ("...he moved everything right?").

229.    Agents have since learned that on CPD officers not associated with this investigation executed a search warrant on apartment 701 at the 1230 Burling building on October 27, 2006 at approximately 9:58 p.m. Officers arrested Marcell THOMAS, who was in the apartment, after the

search yielded a ziplock bag containing cocaine, 7 capsules containing a lookalike substance, 1 green ziplock bag containing cannabis, and 1 .44 caliber bullet. THOMAS's nickname on the arrest report was listed as "Cell." In March of 2007, THOMAS was convicted of possession of a controlled substance and sentenced to 1 year imprisonment for this arrest.

      1.     **Marcell THOMAS'S Additional Arrest History at the 1230 Burling Building**

230.    On November 28, 2005, CPD officers observed THOMAS at the 1230 Burling building directing individuals holding cash to a male holding a clear plastic bag filled with many smaller items. Officers reported that THOMAS was overheard stating, "Get your rocks here," as he pointed to the male holding the clear plastic bag. Officers arrested THOMAS for soliciting unlawful business. In December 2005, THOMAS was convicted and sentenced to a term of court supervision.

231.    On February 20, 2006 at approximately 6:30 p.m., CPD officers at the 1230 Burling building approached Reginald BOOKER and Marcell THOMAS to conduct field interviews. Officers learned that neither lived in the building, and neither had permission to be there. Officers then arrested BOOKER and THOMAS for criminal trespass. Following their arrest, a custodial search of BOOKER yielded a ziplock bag containing cannabis, and a custodial search of THOMAS also yielded a ziplock bag containing cannabis. In March of 2006, the cases on BOOKER and THOMAS were dismissed.

232.    On November 23, 2007, CPD officers chased an individual into apartment 505 at the 1230 Burling building. As officers arrived in the bedroom, they saw Marcell THOMAS toss a plastic bag out the window. Officers recovered the bag and found it to contain 10 ziplock baggies,

70

one of which was subsequently tested and tested positive for cocaine. THOMAS was charged with possession of cocaine, and his case is currently pending.

### L.    Lance OLDEN, aka "LA"

233.    CW1 has reported seeing Lance OLDEN sell drugs for FREEMAN's organization in a stairwell of the 1230 Burling building; CW1 further stated that the drugs were packaged in bags with a blue devil marking. CW4 has stated that through his/her discussions with Rondell FREEMAN and other GDs s/he learned that when Rondell FREEMAN moved his drug operation to 1230 Burling building, FREEMAN assembled a crew of GD members to sell his drugs, including Lance OLDEN (known to CW4 as "LA"). CW4 stated that s/he has seen OLDEN selling crack cocaine packaged in baggies with a blue devil marking at the 1230 Burling building.

234.    On August 9, 2006 at approximately 7:30 p.m., Lance OLDEN called Rondell FREEMAN over Target Phone 4 (Call # 5584) and stated, "Hey, don't forget about me next time either, man."[46] Rondell FREEMAN answered, "All right."

235.    As described earlier in this affidavit, following this call with OLDEN, investigators intercepted a series of calls between Rondell FREEMAN and Syble MCCLUTCHEY in which FREEMAN related that he planned to supply MCCLUTCHEY with a package of narcotics (see paragraphs xx-xx). Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 5584 OLDEN requested that FREEMAN supply him with a package of narcotics ("Hey, don't forget about me next time either man.").

236.    On October 23, 2006 at 11:38 p.m., Adam SANDERS called Rondell FREEMAN over Target Phone 6 (Call # 5696). During this call SANDERS stated, "...look, we have a

---

[46] OLDEN's voice was identified following an August 8, 2007 interview with ATF agents.

discussion, right? ... Is [Individual I] all good?" Rondell FREEMAN answered, "Naw, ain't nobody all good, nigga." SANDERS then asked, "If you ain't from the City, is you all good?" FREEMAN answered, "Nah, nigga you know the business…" SANDERS stated, "…We talking, we discussin' right. Uh, I had pulled a little stunt." FREEMAN asked, "So, what motherfuckers mad…who, who got mad?" SANDERS answered, "Everybody." FREEMAN asked, "Who is everybody?" SANDERS answered, "Little B, [Individual L], LA, [Individual M]." SANDERS asked, "Is [Individual F] all good?" FREEMAN answered, "Hell no, nigga….No motherfucker is all good…" Seconds later FREEMAN asked, "So, so, you put somebody out there? And, a motherfucker said something?" SANDERS answered, "Yea." FREEMAN then suggested, "They can have the nights…we can have the day shift…Fuck it."

237.     Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call SANDERS asked FREEMAN whether others who are not part of FREEMAN's drug trafficking organization should be permitted to sell drugs at the 1230 Burling building ("If you ain't from the City, is you all good?"). I further believe that FREEMAN informed SANDERS that he had not authorized others to sell drugs at the building ("Naw, ain't nobody all good, nigga."), and reminded SANDERS that he knew his (FREEMAN's) instructions ("Nah, nigga, you know the business…"). I also believe that SANDERS related that FREEMAN's drug workers, including Daniel HILL and Lance OLDEN, were upset about FREEMAN's instructions ("Who got mad?"). I further believe that SANDERS informed FREEMAN that he removed someone from the 1230 Burling building who was selling drugs on behalf of someone other than FREEMAN(FREEMAN: "So, so you put somebody out there?" SANDERS: "Yea."). I also believe

72

that out of frustration, FREEMAN suggested possibly sharing the building's narcotic sales with others ("They can have nights...we can have the day shift...Fuck it.").

238.    On October 24, 2006 at approximately 12:36 a.m., Adam SANDERS called Rondell FREEMAN over Target Phone 6 (Call # 5700). During this call FREEMAN asked, "Who you was with?" SANDERS answered, "...I was with LA and [Individual M], man." FREEMAN replied, "They the phoniest ones, man." SANDERS answered, "I already know, man." SANDERS then related, "... [Individual M] asked me, 'So the end can come in here and serve...it's all good for them...do their thing?'" FREEMAN stated, "They bitches. I can't wait and beat this case. I'm come hold, I'm come hold down...the shorties...up there ... Those niggas cowards...Everybody do what the fuck they want, man." FREEMAN continued, "Lets just say, for instance, when you was locked up...You ain't get no money orders. But all them niggas in there doing what the fuck they doing. Little B know that. [Individual L] know that. LA know that. [Individual M] know that...why you couldn't get twenty-five dollars from each one, motherfucker?"

239.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 5700 SANDERS informed FREEMAN that he had spoken with Lance OLDEN earlier ("I was with LA"), and that Individual M had asked why gang members from the Cabrini Row Houses were selling drugs at the 1230 Burling building ("[Individual M] asked me, 'So the end can come in here and serve...it's good for them...do their thing?'"). I believe FREEMAN stated that after his criminal case was dismissed, he planned to commit acts of violence against his drug workers for their lack of loyalty ("They bitches. I can't wait and beat this case. I'm come hold, I'm come hold down...the shorties...up there."). I also believe that FREEMAN explained that when SANDERS was imprisoned, his drug associates, including Daniel Hill ("Little B") and Lance

73

OLDEN, ("LA know that") failed to send money to SANDERS ("...when you was locked up...why couldn't get twenty-five dollars from each one, motherfucker?").

240.    Seconds later in the same telephone call, SANDERS stated, "They say we gonna talk to them calm, right. Talk to the...not supposed to be in here...tell them....there ain't no more...Man, I say that shit is over with. It's too late. You all let them in. Now, we got to be aggressive. Now we got to slap the shit out of one of them...." FREEMAN replied, "...them bitch-ass niggas don't want no trouble ... That's what a motherfucker got to do, beat a nigga's ass, your own guys...Mistreat them..." SANDERS stated, "When Bob, like we just going to continue, do it like, when Bob get up there everybody move out the way. When he leaves, you all do what you all want to do, man." FREEMAN stated, "That's why I want you to be watching them shorties. Make sure they ain't go now where. And you stay your ass out there."

241.    Based on my training and experience, as well as my knowledge of this investigation, I believe that SANDERS told FREEMAN that members of his drug trafficking organization wished to speak with the drug dealers who were not part of FREEMAN's organization ("They say we gonna talk to them calm, right ... Talk to the...not supposed to be in here..."), and tell them to get out of the 1230 Burling building ("...tell them...there ain't no more..."). I believe SANDERS further stated that members of FREEMAN's drug trafficking organization needed to commit violence against drug dealers who were not part of FREEMAN's organization ("Now, we got to be aggressive. Now we got to slap the shit out of one of them..."). I also believe that FREEMAN suggested committing acts of violence against his own drug workers ("That's what a motherfucker got to do, beat a nigga's ass, your own guys...Mistreat them...") and instructed SANDERS to

74

continue overseeing the activities of his drug workers to make sure they remained loyal to him ("That's why I want you to be watching them shorties…you stay your ass out there.").

        1.        **Purchase of 14.7 Grams of Crack Cocaine from Lance OLDEN**

242.    On June 20, 2007, agents met with CW4 in order to conduct a controlled purchase of drugs from Lance OLDEN. Agents searched CW4 and his/her car for the presence of drugs and excess cash, with negative results. Agents then provided CW4 with $750 and outfitted him/her with a recording device. Agents then surveilled CW4 as s/he drove to a parking lot east of the 1230 Burling building and met with a black male.

243.    The recording from the meeting reveals that the following conversation occurred:

| | |
|---|---|
| CW4: | Hop in L.A., hop in L.A., hop in. Hold on, hold on, hold on. |
| | [sound of car door opening and closing] |
| | *** |
| CW4: | Hey, uh, my guy up north want some, uh, (unintelligible). It's like hot right now and shit. He want to hit it. |
| OLDEN: | How much, how much he paying? …. See what he talking about. |
| CW4: | What you talking about?.... |
| OLDEN: | See what he talking about. How much, how much it is up there?... |
| CW4: | What your price is? |
| OLDEN: | I don't know. I got to know what his price is. You know what I'm talking about? |
| CW4: | I'm call my, I'm call him and see what he talking about. |
| OLDEN: | Hey, see what he talking about. |

CW4:        And we'll see, today or tomorrow?

OLDEN:      It don't matter. Today or tomorrow, nigga.

CW4:        Cool. I'm a call him.

OLDEN:      Just call my phone....708-439-6219.

244.    OLDEN left CW4's car at 5 p.m.  At 5:02 p.m., CW4 called OLDEN at phone number 708-439-6219.

CW4 [on phone:]    He say, um, he pay five hundred.... He say five hundred....Yea. Right now.  All right.

245.    At 5:27 p.m., CW4 and OLDEN met again in CW4's car at the parking lot east of the 1230 Burling building.

OLDEN:      ....That's fifteen grams. That's fifteen point two.

246.    OLDEN then left CW4's car and got into his own.  As he pulled away from the deal, surveilling agents observed his face and identified him as OLDEN.  When CW4 returned to agents, s/he provided them with a clear plastic baggie containing a white rock-like substance that later tested positive for 14.7 grams of cocaine base. Agents then again searched CW4 for excess cash and drugs, with negative results.[47] [48]

---

[47]  CW4 explained to agents that s/he paid OLDEN $500 for the drugs in this deal, and the additional $250 for a previous gun OLDEN had given CW4.  The payment of $250 is reflected in CW4 and OLDEN's conversation at the beginning of the deal [not included here].

[48]  During agents' August 8, 2007 interview with OLDEN, he stated that he lived in apartment 1506 at the 1230 Burling building.  Although OLDEN admitted to having sold crack cocaine in the 1230 Burling building in the past, he claimed that: (1) he had been supplied by someone other than FREEMAN, (2) he had sold crack packaged in ziplock baggies with a blue *dolphin* marking, not a blue devil marking, and (3) he had only sold crack in the building for only approximately one year.  OLDEN claimed that he has been selling "weed" in the 1230 Burling building for the past year, but claimed he was not supplied his "weed" by FREEMAN.  OLDEN also claimed that FREEMAN's drugs had not been sold in the 1230 Burling building for the past year, and claimed he did not know anyone who has sold FREEMAN's drugs, which he acknowledged were sold in ziplock baggies with a blue devil marking.

### M.    Lonnie MACK, aka "L Dub," "Dub,"

247.    Both CW1 and CW4 have stated that Lonnie MACK's nicknames are "L Dub" or "Dub." Both know FREEMAN to supply MACK with marijuana, and know MACK to in turn supply others with marijuana to sell on MACK and FREEMAN's behalf in the 1230 Burling building.

248.    As described in paragraphs 40-41, on April 10, 2007 CPD officers arrested Lonnie MACK for possession of cannabis after he left the Target Unit. While being processed for this arrest, MACK related (post-*Miranda*) that if allowed to make some telephone calls, he would be able to arrange the turn-in of a weapon being stored by the Gangster Disciples street gang.[49] Officers then allowed MACK to place several calls from his cellular telephone. After doing so, MACK informed them that a handgun was located near the basketball court at the 1230 Burling building. Agents then went to the basketball court and recovered a KBI .45 caliber pistol.

On November 2, 2006 in Call #7611, FREEMAN was intercepted over Target Phone 6 instructing MACK to "Tell [Individual J] to give you that couple of dollars." FREEMAN then asked, "Where you all at, in the lot?" MACK responded that they were in the "lot," and asked FREEMAN if he had heard that [Individual G] had "died with a needle in her arm on the 15th floor?"[50] Approximately 21 minutes later, at 7:29 p.m. in Call # 7620, FREEMAN was intercepted over Target Phone 6 instructing ADAM SANDERS, "Tell Dub to bring you right quick." SANDERS then responded, "...that bitch dirty...he back and forth...yep, no good."

Based on my training and experience, and my knowledge of this investigation, I believe that in these calls FREEMAN was asking if MACK was in the parking lot of the 1230

---

[49]  CW1 has reported that MACK is a GD.

[50]  Lonnie MACK's voice was identified following his April 10, 2007 arrest.

Burling building ("Where you all at, in the lot?"). I further believe that MACK was referring to a

drug user who had died when he asked FREEMAN if he had heard that [Individual G] had "died

with a needle in her arm on the 15th floor." I also believe that SANDERS believed MACK to have

drugs on him, and that he (SANDERS) did not want MACK, to drive him to FREEMAN

("[Dub]...that bitch dirty...he back and forth...yep, no good.").

### 1.    Lonnie MACK's arrest history at the 714 Division building

249.    On January 16, 2001, CPD officers arrested MACK on the 9th floor of the 714

Division building for soliciting unlawful business and then fleeing after officers approached him.

A custodial search of MACK yielded $1,220 in cash. This case was later dismissed.

### N.    Terrance SEWELL, aka "T-Money"

250.    On October 27, 2006, surveillance footage from the Target Complex revealed that

at approximately 1:40 p.m., a black Range Rover parked in the assigned parking spot for the Target

Unit. Senecca WILLIAMS exited the Range Rover and walked towards the complex.

251.    Approximately twenty-five minutes later at 2:04 p.m., Rondell FREEMAN used

Target Phone 6 to call Terrance SEWELL (Call # 6255) at cellular telephone number (773)

699-8894.[51] FREEMAN asked, "Where you at, T-Money?" SEWELL responded, "I'm at the Daley

Center." FREEMAN then stated, "Call when you need that. I got that for you." SEWELL replied,

"Ya, alright, ok."

252.    At 2:22 p.m., Rondell FREEMAN spoke over Target Phone 6 with Reginald

BOOKER, who was using Target Phone 7 (Call # 6261). FREEMAN asked, "What's up with them

caps, man?" Reginald BOOKER replied, "Shit moving slow right now..." At 3:09 p.m., Rondell

---

[51]  SEWELL's voice was identified following his interview on March 19, 2007, described in paragraph 265, and
later compared with this call.

FREEMAN used Target Phone 6 to call Syble MCCLUTCHEY in Call # 6276. FREEMAN stated, "I'm on my way over there." MCCLATCHEY replied, "All right, baby."

253.    Surveillance footage from this date revealed that at approximately 3:24 p.m., Rondell FREEMAN walked to the Range Rover carrying a black plastic bag, and left the Target Complex's parking lot.

254.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in Call # 6255 FREEMAN informed SEWELL that he was ready to supply him with a package of narcotics ("Call when you need that. I got that for you.").

255.    On November 1, 2006 at 10:11 p.m., Rondell FREEMAN received a call over Target Phone 6 from Adam SANDERS (Call # 7531). During the call FREEMAN instructed SANDERS, "Don't give them caps to nobody. T-Money said motherfucker dippin' out of them, too. Go buy some tape from across the street, scotch tape, put it around the motherfucker."

256.    Based on my training and experience, as well as my knowledge of this investigation, I believe that in this call FREEMAN told SANDERS that Terrance SEWELL informed him that individuals were tampering with and/or stealing capsules of heroin FREEMAN's drug associates were selling ("Don't give them caps to nobody. T-Money said motherfucker dippin out of them too."). I also believe that FREEMAN instructed SANDERS to purchase tape and wrap it around the capsules of heroin so as to prevent anyone from tampering with or stealing them ("go buy some tape from across the street, scotch tape, put it around the motherfucker.").

257.    On November 3, 2006 at 7:40 p.m., Rondell FREEMAN used Target Phone 6 to call Adam SANDERS (Call # 7762). During this call SANDERS stated, "We found them....them capsules." FREEMAN asked, "Where they at now?" SANDERS answered, "I got them. It's almost

79

over with ... ask T-Money. T-Money came through today. So we going to do the tape next time."
FREEMAN replied, "All right."

258.    Based on my training and experience, as well as my knowledge of this investigation,
I believe that in this call SANDERS stated that FREEMAN's drug associates had located some
missing capsules of heroin ("We found them...them capsules."). I also believe that SANDERS
stated Terrance SEWELL had been informed FREEMAN's organization had sold almost all of the
heroin ("It's almost over with ... ask T-Money."), and that SEWELL had traveled to the 1230 Burling
building to supply them with the drug ("T-Money came through today."). I further believe that
SANDERS stated that he and FREEMAN's drug associates planned to tape the next supply of
capsules so as to prevent additional tampering and/or stealing ("So, we going to do the tape next
time.").

259.    On January 18, 2007 at approximately 7:34 p.m., agents surveilling the Target
Complex observed a red Oldsmobile minivan arrive in the complex's southwest parking lot and park
in the assigned parking spot for the Target Unit. FREEMAN then got out of the van and entered the
Target Complex.

260.    At approximately 9:08 p.m., Senecca WILLIAMS exited the Target Complex through
the service door and meet with a black male resembling Terrance SEWELL. Both then entered the
Target Complex and walked into an elevator. Approximately 10 minutes later, the male resembling
SEWELL left the complex and walked out of agents' sight. Seconds later, a Toyota Camry pulled
out of the Target Complex's parking lot. Agents followed the Camry as it drove to the apartment
complex located at 900 W. Gunnison Avenue.

261.    On January 19, 2007 at approximately 12:15 a.m., agents observed the same black male they had earlier observed at the Target Unit enter the Camry and leave Gunnison Avenue. CPD officers effected a traffic stop of the Camry and identified the driver as Terrance SEWELL.

262.    On January 19, 2007, surveillance footage from the Target Complex revealed that at approximately 1:55 p.m. a black male resembling Rondell FREEMAN discarded a yellow plastic shopping bag into the trash dumpster located directly under the complex's trash chute. Moments later, the red minivan parked in the assigned parking spot for the Target Unit left the parking lot. Approximately an hour later, an agent approached the trash dumpster and found a plastic bag similar in size, color, and location to the one previously deposited at the bottom of the dumpster. The bag contained narcotic packaging paraphernalia similar to that recovered during previous trash pulls, including Dormin and Sleepinal pill packaging, latex gloves, and ziplock baggies.

263.    Based on Rondell FREEMAN and Senecca WILLIAMS presence at the Target Unit, the narcotic paraphernalia recovered from FREEMAN's trash, as well as my knowledge of this investigation, I believe that FREEMAN and WILLIAMS prepared and packaged narcotics, some of which were then supplied to Terrance SEWELL.

### 1.    Search of Terrance SEWELL's Residence

264.    On March 19, 2007, agents executed a federal search warrant on Terrance SEWELL's residence at 900 W. Gunnison, Unit 106, Chicago. Agents' search yielded approximately 43 grams of crack cocaine, a digital scale, and a Taurus .45 caliber pistol with eight rounds of ammunition.

265.    During the search of SEWELL's residence he agreed to speak with agents after waiving his *Miranda* rights in writing. SEWELL then provided agents with oral and written statements. SEWELL told agents he was a former Gangster Disciple street gang member, and that

81

since his 2005 release from prison, he had been selling crack cocaine. SEWELL stated that he would

purchase an ounce of crack cocaine every few weeks, which he would then repackage for resale.

SEWELL stated that we would make $3,000 - $4,000 per ounce sold, and admitted that his only

source of income was from drug sales. SEWELL informed agents that 14 grams of crack cocaine

and a .45 caliber pistol were stored in his apartment; SEWELL claimed, however, that the pistol did

not belong to him, and stated that he was storing it for someone else. SEWELL told agents he had

two drug suppliers who were gang members, but did not mention FREEMAN. Because agents did

not want to compromise the investigation into FREEMAN, they did not specifically question him

about FREEMAN.

    **O.**    **Demarquis WILLIAMS, aka "Buck"**

    266.    As outlined in paragraphs 50-53 and 64-65, on March 25, 2006, Rondell FREEMAN

was intercepted in the Target Unit speaking with Demarquis WILLIAMS over the phone about

collecting drug proceeds.

    267.    Both CW1 and CW4 know Demarquis WILLIAMS's nickname to be "Buck." Both

have also informed agents that WILLIAMS sells drugs for Rondell FREEMAN in the 1230 Burling

building packaged in zip lock baggies with a blue devil marking.

    268.    On October 8, 2006, agents conducted a trash pull as described in paragraphs 36-38.

Among the items recovered were Empty Dormin and Sleepinal pill packagings, Latex gloves, 6

plastic bags with suspect heroin residue, and torn pieces of paper with hand written names and

numbers. One such notation read "Buck 2800." Based on my training and experience, I believe the

torn pieces of paper were part of a drug ledger, and I believe the notation "Buck 2800" reflected a

$2800 drug debt owed by WILLIAMS.

### 1.    Demarquis WILLIAMS's Arrest History at the 1230 Burling Building

269.    On November 28, 2005, WILLIAMS was arrested on the 7th floor of the 1230 Burling building after officers observed him drop to the ground a plastic bag containing small ziplock bags of cocaine.  In May 2006, WILLIAMS was convicted of manufacture/delivery of cocaine, and sentenced to 18 months' felony probation.

270.    On December 6, 2005, WILLIAMS was arrested after officers observed him flee into apartment 702 of the 1230 Burling building and toss out the window a plastic bag containing capsules of heroin.  In May 2006, WILLIAMS was convicted of manufacture/delivery of heroin and sentenced to 18 months' felony probation.

271.    On March 30, 2007, CPD officers received information that narcotics sales were occurring in the lobby of the 1230 Burling building.  Officers then relocated there, observed WILLIAMS attempt to flee.  Officers apprehended him and conducted a pat-down search, during which they recovered a large plastic bag from his waistband.  The bag contained 330 smaller baggies of crack cocaine with a blue devil marking.  In September 2007, WILLIAMS was convicted of manufacture/delivery of cocaine and sentenced to 4 years of imprisonment for this arrest.

FURTHER AFFIANT SAYETH NOT.

Joseph Delucio
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives


SUBSCRIBED AND SWORN TO BEFORE ME THIS 17th of December, 2007.

Honorable Sidney I. Schenkier
United States Magistrate Judge

83